**SUNTRUST BANK, Plaintiff,**

v.

**BLUE WATER FIBER, L.P., et al., Defendants.**

No. 98–73883.

United States District Court, E.D. Michigan, Southern Division.

Aug. 31, 2002.

Lisa M. Clark, Dickinson Wright, James J. White, University of Michigan Law School, Ann Arbor, MI, Eric H. Lipsitt, Deborah H. Boshaw, Williams Mullen, Detroit, MI, Erik P. Kimball, Nabors, Giblin, Orlando, FL, Daniel F. Berry, Mark T. Butler, Williams, Mullen, Detroit, MI, for plaintiff.

Bruce T. Wallace, Hooper, Hathaway, Ann Arbor, MI, James J. Vlasic, Jennifer M. Grieco, Sommers, Schwartz, Southfield, MI, for defendants.

*MEMORANDUM OPINION AND ORDER*

PEPE, United States Magistrate Judge.

On May 15, 2002, Plaintiff filed a motion to preclude testimony, or alternatively compel discovery (docket entry 267). On May 30, 2002, the Eddy Defendants[1] filed their response, and Plaintiff filed a reply on June 13, 2002. A telephonic hearing was held on July 1, 2002, and it was ordered that supplemental briefs be filed on the issue of whether a party can file a motion to compel discovery approx-

---

1. The Eddy Defendants are Port Huron Fiber Corporation, E.B. Eddy Forest Products, Ltd., E.B. Eddy Paper, Inc. and Domtar Inc.

imately 18 months after discovery has closed, after the dispositive motion deadline has passed, and after dispositive motions have been filed. On July 15, 2002, Plaintiff filed its supplemental brief and on July 29, 2002, the Eddy Defendants filed their supplemental response. This matter was referred for a hearing and determination pursuant to 28 U.S.C. § 636(b)(1)(A). For the following reasons, Plaintiff's motion is denied.

*BACKGROUND*

The background surrounding this controversy is incredibly complex. While a thorough recounting of the background might not be needed to resolve the current motion, a general synopsis of the underlying litigation and principal players will be helpful.

This dispute arose in the context of a construction contract for a mill to process recycled paper into de-inked pulp for sale to paper mills. The mill was a collaborative effort between an engineering and construction firm that specialized in such plants (Rust Defendants) and the owner of the paper mill (Eddy Defendants). Once it became operational, the mill was to be jointly owned and operated by Blue Water Fiber Limited Partnership, an equal partnership consisting of two general partners: Port–Huron Fiber, a subsidiary of Eddy, and RCC, a subsidiary of Rust. In sum, Defendant Rust built the de-inking plant and Blue Water was to be the owner and operator of the plant. Blue Water is a limited partnership owned by RCC and Port Huron Fiber.

Blue Water borrowed $76 million from the Michigan Strategic Fund to finance the plant. Series 1994 bonds were issued to raise this money. Prior to construction, Blue Water (owner of mill) and Rust (contractor) entered into an engineering, procurement, and construction contract ("EPC contract"). If the plant failed to meet certain performance standards, in accordance with the EPC contract, Blue Water had the option to require Rust to assume Blue Water's loan repayment and to purchase the partnership interest of Port Huron Fiber (Eddy subsidiary). Pursuant to the EPC contract, the put option was exercisable only if it was determined through arbitration that a number of complex, technical defects and failures set forth in the contract had occurred. The put option was to protect the Eddy side of the Blue Water partnership, and the exercise of the option was to be determined exclusively by Port Huron (the Eddy subsidiary).

Upon its completion in 1995, the mill had a number of operational problems. Rust and Eddy blamed each other and the disputes between them culminated in four separate complex legal proceedings (two lawsuits and two arbitrations). In May 1997, Blue Water attempted to exercise the put option, and entered into non-binding mediation in August 1997. Rust contended that the conditions for exercising the put option had not been met. The issue of whether the put option was exercisable by Blue Water was added to the pending arbitration between the parties.

The market for de-inked pulp declined as the parties were embroiled in litigation. Concern over the mill's ability to service its debts led bondholders in August 1997 to arrange for a mediation meeting in Boston. The desired outcomes of the Boston mediation were (1) the resolution of the disputes between Rust, Eddy and Blue Water, and (2) an agreement to restructure the bonds.

A "Settlement Agreement" was entered into by Blue Water, Rust and Eddy sometime between April and May of 1998. One of the terms of the agreement was that the parties released each other from all obligations, disputes and controversies arising out of the EPC contract. The instant lawsuit is based on the parties' varying interpretations of what happened at the Boston mediation and whether the actions of the Rust and Eddy Defendants in settling their claims were legally justified. The bondholders argue that the Rust–Eddy–Blue Water settlement was kept secret from them, and the contract documents did not permit Blue Water and Rust to settle their dispute about the put option without the bondholders' approval. Less than 2 months after the Boston mediation, the original bondholders sold their 76 million dollar bonds to the current Plaintiffs, a group of vulture fund bondholders for 47 million.

Further restructure negotiations between Blue Water and new boldholders in the

spring and summer of 1998 failed to result in an agreement. In September 1998, the new bondholders filed this lawsuit against Blue Water and various Rust and Eddy corporate entities. Plaintiffs argue that at no time did any trustee or bondholder agree or otherwise acquiesce to the unilateral release of the "Put Option." Shortly thereafter, the new bondholders attempted to accelerate the debt and as a result Blue Water was forced to file for bankruptcy. The current Plaintiffs (the new bondholders) bought the Blue Water mill at the bankruptcy. As a result, Blue Water is no longer a defendant in this litigation.

This lawsuit has been pending for four years and many claims have been dismissed. The one claim remaining against the Eddy defendants is for tortious interference with contract. Plaintiff asserts that the Eddy defendants improperly interfered with its (the bondholders') alleged rights under the EPC contract by secretly settling their differences with Rust and by signing a settlement agreement to dismiss the lawsuits and arbitrations to which they were parties. The Court recently ordered bifurcation of the issues for trial. Question one will be whether the 1997 Blue Water settlement was valid and bars Plaintiff's claims. If no, then the next question will address the substantive and complex claims relating to the mill's performance.

### CURRENT MOTION TO PRECLUDE TESTIMONY OR COMPEL DISCLOSURE

With respect to the current motion, Plaintiff argues that the attorney-client privilege formerly held by Blue Water has passed to the Bondholders, who purchased Blue Water out of bankruptcy. Therefore, through this motion Plaintiff wants all documentation held by Dickenson Wright, Blue Water's former attorneys.[2] According to Plaintiff, the Eddy Defendants cannot assert the attorney client privilege because the partnership interests previously held by Port Huron and RCC (the partners of Blue Water) were assigned to BWF Acquisitions, which is affiliated with the current Bondholders. Defendants argue that the relevant question is whether an adverse party who has sued a partnership can purchase the partnership and then waive the attorney client privilege of that partnership's individual partners. Each party cites cases that are not exactly on point [3] and admit that

2. In their brief for bifurcation, the Eddy Defendants proffered the testimony of Clarence Pozza, an attorney from Miller, Canfield, Paddock & Stone, and James Samborn, an attorney from Dickenson Wright, for the following: "The Court can hear first hand from Messrs. Pozza and Samborn the reasons that they advised their clients to enter into the settlement and their legal basis for doing so .... and their legal conclusions as to the propriety of the settlement and their good faith business reasons for advising their clients to enter into it." (See Exhibit 2 to brief in support of Plaintiff's motion.) According to Plaintiff, based on this proffer of the Pozza and Samborn testimony, it filed its current motion to preclude testimony or alternatively to compel discovery. Plaintiff contends that the Eddy Defendants, by placing the advice of their former counsel and Blue Water's former counsel at issue, have waived their right to invoke the attorney-client privilege or work product doctrine. Therefore, through this motion, Suntrust sought to limit the Eddy Defendants' ability to present such testimony or, in the alternative to compel Eddy to allow discovery as to such evidence that it had previously claimed a privilege. In response, the Eddy Defendants argued that they do not intend to elicit any testimony from Mr. Samborn or Mr. Pozza that would involve the attorney-client privilege or work product doctrine. Rather, the Eddy Defendants maintain that the reasons Mr. Pozza and Mr. Samborn advised their clients to enter into the settlement

and their legal conclusions as the propriety of the settlement were discussed in detail, publicly, with non-clients and therefore were not privileged. Before the July 1, 2002, telephonic hearing on this motion, the parties resolved this issue. It was agreed that the Eddy Defendants would not present any materials or elicit testimony from any witnesses on topics that are subject to Eddy's claims of attorney-client privilege or work product doctrine. The issue that remains unresolved—and is the subject of this memorandum opinion and order—concerns whether Plaintiff is entitled to all testimony and documentation held by Dickenson Wright, Blue Water's former attorneys, because, as Plaintiff alleges, the attorney-client privilege formerly held by Blue Water has passed to the Bondholders, who purchased Blue Water out of bankruptcy. As discussed above, the undersigned does not need to reach this substantive issue because Suntrust filed its motion to compel eighteen months after the close of discovery, and it is therefore grossly tardy.

3. Plaintiff primarily relies on *Commodity Futures v. Weintraub*, 471 U.S. 343, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985) where the Supreme Court held that when control of a corporation passes to new management, the authority to assert and waive the corporation's attorney client privilege passes to the new entity in control. Defendants vehemently argue that partnerships are different than corporations, and that *Commodity Partners*

no case addresses the specific question posed here: whether in *ongoing litigation* a litigant can gain access to its adversary's attorney client privilege by buying its adversary's assets. While this issue appears to be one of first impression, it does not need to be resolved here, because Suntrust filed its current motion to compel approximately 18 months after the close of discovery, after the dispositive motion deadline has passed, and after dispositive motions have been filed. As discussed below, Plaintiff's motion is denied based on timing.[4]

### DISCUSSION

A district court enjoys broad discretion in managing discovery. *See Ghandi v. Police Dep't of City of Detroit,* 747 F.2d 338, 354 (6th Cir.1984). "[I]t is well established that the scope of discovery is within the sound discretion of the trial court. Accordingly, denials of motions to compel discovery are reviewed only for an abuse of discretion." *Lavado v. Keohane,* 992 F.2d 601, 604 (6th Cir.1993) (internal citations omitted). A district court may properly deny a motion to compel discovery where the motion to compel was filed after the close of discovery. *Willis v. New World Van Lines, Inc.,* 123 F.Supp.2d 380, 401 (E.D.Mich.2000) (citing *Ginett v. Federal Express Corp.,* 166 F.3d 1213 (6th Cir.1998)). While Plaintiff is correct that there is no authority that automatically precludes the filing of a motion to compel discovery after the close of discovery

and after the filing of dispositive motions [5]— indeed, it is within the discretion of the Court—a chronology of pertinent events in this case and review of applicable case law shows that Plaintiff's tardy motion should be denied.

By stipulated order dated July 7, 2000, the discovery cutoff for this case .was set for September 30, 2000, which was subsequently extended by 15 days by agreement of the parties. The district court's standing order regarding case management provides that "discovery is to be completed on or before the date indicated in the attached Order or any subsequent amendment." The Court's Stipulated Case Management Order No. 1 specifically addresses the issue of privileged documents and requires that "within a reasonable time after production of documents, not to exceed 60 days, or by the close of discovery, whichever is shorter, each producing party shall provide a privilege log ...". On September 7, 2000—five weeks before the close of discovery (which was extended to October 15, 2000, by agreement of the parties)—the Eddy Defendants submitted to Plaintiff the Dickenson Wright privilege log. On September 29, 2000—two weeks before the close of discovery—Dickenson Wright attorney Mr. Samborn was deposed. Therefore, as pointed out by the Eddy Defendants, the Bondholders had in September 2000 all the information they needed to determine

---

does not apply where the party attempting to control the partnership's attorney client privilege was actually *litigating against the individual partners at the time it purchased their interest in the partnership.* Plaintiff responds by asserting that *U.S. v. Campbell,* 73 F.3d 44 (1996) extended the reasoning of *Commodity Partners* from a bankrupt corporation to a bankrupt partnership—the exact situation here. Yet, the Eddy Defendants argue that (1) *Campbell* was wrongly decided and (2) inapplicable to the facts here. According to Defendants, in *Campbell* the trustee who assumed management of the bankrupt partnership did not have an adverse interest against the individual partners. Conversely, here, the trustee (the Bondholders) had sued the partnership and individual partners prior to buying its assets. As explained above in the text, the undersigned does not need to address this interesting and novel question.

4. In its supplemental brief, Plaintiff states that at the July 1, 2002, telephonic hearing, the under-

signed *sua sponte* brought up the issue of timing. This is not accurate. The Eddy Defendants in their response to Plaintiff's motion (pp. 11, 19) argued that Suntrust's motion should be denied based on timing alone but also addressed the substantive issues. In any event, a court may *sua sponte* bring up issues that it feels are germane to the controversy, and ask for supplemental briefs on the issue to give each side a fair opportunity to be heard.

5. Fed.R.Civ.P. 37, which deals with discovery, provides no deadline for filing of a motion to compel. Fed.R.Civ.P 16(b) authorizes the judge or magistrate to make scheduling and planning orders. In particular, Rule 16(b)(3) enables the Court to limit the time to complete discovery. Further, "[a] schedule shall not be modified except upon a showing of good cause and by leave of the district judge or, when authorized by local rule, by a magistrate judge." Fed.R.Civ.P. 16(b).

whether the nature of the documents withheld or the substance of Mr. Samborn's testimony warranted filing a motion to compel production of the privileged documents or to preclude Mr. Samborn's testimony. The Eddy Defendants have consistently objected to the discovery of the Dickenson Wright privileged documents since the onset of this litigation.

Plaintiff vehemently contends that it was not until the proffer in Defendants' bifurcation motion in October 2001 that it realized the extent to which the Eddy Defendants were going to rely on the testimony of Mr. Samborn in phase I of the bifurcated trial. Yet, as conceded by Plaintiff, it sent a letter on May 15, 2000 (five months before the close of discovery) notifying the Eddy Defendants that it would object to any attempt by them to assert the attorney client privilege as to Dickenson Wright documents. Nonetheless, as discussed previously, the Eddy Defendants withheld many documents based on privilege from production to Suntrust and turned over a privilege log in September 2000. Plaintiff contends that it was hoping that this issue could be resolved without the intervention of the Court, and to this end sent letters on May 14, 2001, May 30, 2001, and December 6, 2001 (all after discovery had closed) to the Eddy Defendants seeking production of the withheld Dickenson Wright documents. After dispositive motions were filed, and after the district court ordered bifurcation, Suntrust filed the present motion in May 2002—approximately 18 months after discovery had closed.

Suntrust maintains that it has been lenient with the Eddy Defendants and informally extended discovery deadlines for them pending proposed settlement negotiations or resolution of dispositive motions. Thus, Suntrust insinuates that Defendants cannot fairly contest a tardy discovery motion. The Eddy Defendants counter that, except for a few mutually agreed-upon extensions years ago, there has been no pattern of discovery extensions requested by Eddy and granted by Suntrust. As the Eddy Defendants explain, the discovery that was extended was to elicit *amended* answers to discovery which the Eddy Defendants had timely answered.

Plaintiff cites cases to support its position that, based on the Court's discretion, its tardy discovery motion should be allowed. Yet, most of these cases do not concern discovery motions at all, and none discuss post cut-off discovery motions. In fact, the case law seems to go the other way. In numerous cases, courts have denied tardy discovery motions that were filed after the close of discovery, especially where the moving party had all the information it needed to timely file the discovery motion, and its late filing would prejudice the non-moving party. *See, e.g., Ginett v. Federal Express,* 166 F.3d 1213 (6th Cir.1998) (unpublished opinion) (affirming trial court's denial of motion to compel some two months after the discovery cut-off, because the plaintiff knew of the document at issue long before the discovery deadline and failed to file a motion at that time); *Willis v. New World Van Lines, Inc.,* 123 F.Supp.2d at 401 (denying motion to compel discovery that was filed four months after the close of discovery and five days before hearing on summary judgment motion); *Packman v. Chicago Tribune Co.,* 267 F.3d 628, 647 (7th Cir.2001) (finding no abuse of discretion in denying plaintiff's motion to compel discovery after discovery closed, after summary judgment briefing schedule had been set, and defendants had filed their summary judgment motion); *Kalis v. Colgate–Palmolive Co.,* 231 F.3d 1049, 1058 (7th Cir.2000) (finding no abuse of discretion in denying motion to compel filed after discovery closed, summary judgment motion was filed, briefing schedule was set, and plaintiff's response was due); *Gault v. Nabisco Biscuit Co.,* 184 F.R.D. 620, 622 (D.Nev.1999) (denying plaintiff's motion to compel as untimely where motion was filed 76 days after the close of discovery and 136 days after the receipt of defendant's answers to interrogatories and requests for production of documents, and there was no indication that the delay in filing the motion was caused by matters outside the control of plaintiff and his attorney); *American Motorists Ins. Co. v. General Host Corp.,* 162 F.R.D. 646, 648 (D.Kan.1995) (denying defendant's motion to compel, even though the information it sought was likely relevant, because it provided no excuse for waiting two years after discovery deadline to

compel information, which plaintiff had objected to producing long before discovery deadline, and where case was 11 years old, and dispositive motions were pending).

The case of *Choate v. National Railroad Passenger Corp.*, 132 F.Supp.2d 569 (E.D.Mich.2001) is particularly instructive. In *Choate*, the plaintiff filed a motion to compel discovery on January 31, 2001, when discovery had closed on October 18, 2000, approximately 3.5 months earlier. *Id.* at 573–74. In denying plaintiff's motion to compel, the court stated:

> There are time limits prescribed by the Federal Rules of Civil Procedure and this Court's orders for the purposes of protecting parties from abuse and encourages parties to act. This Court's policies state that,
>
> > Requests for remedies for abuse of discovery shall be promptly brought to the attention of the court by appropriate motion. Failure to promptly enforce discovery rights may be construed by the court as a waiver of the right to enforce such rights. *Repeated promises of an opponent to respond to discovery is an insufficient justification for failing to timely enforce discovery rights.*
>
> This Court concludes that Plaintiff's failure to promptly enforce his discovery rights constitutes a waiver of such rights.

*Id.* at 574. (Emphasis added.) Here, the Eddy Defendants did not make repeated promises that they would respond to the discovery and produce the Dickenson Wright documents. Quite to the contrary, since May 2000, they have consistently refused to produce what they believe are privileged documents. Therefore, Plaintiff's untimely discovery motion should be denied.

Suntrust maintains that the Eddy Defendants cannot possibly be surprised or prejudiced by this late motion to compel because they were on notice back in May 2000 that

Suntrust sought the Dickenson Wright documents. Yet, this argument cuts both ways. The Eddy Defendants could have assumed that since discovery closed on October 15, 2000, and because Suntrust never filed a motion to compel when it was well aware of the Eddy Defendants' persistent refusal to provide these documents, that it was not a priority or that Plaintiff decided to honor their claims of privilege. Although Plaintiff sent letters in May and December 2001 requesting the Dickenson Wright documents, there was no reason it could not have filed a motion to compel earlier than May 2002.[6] Indeed, its motion to compel has been filed after dispositive motions have been filed and after the Court has ordered bifurcation. The Eddy Defendants have consistently stated that these documents are privileged and will not be produced. They timely submitted their privilege log five weeks before discovery closed, and Mr. Samborn was deposed two weeks prior to the close of discovery. Furthermore, despite Suntrust's claims to the contrary, allowing the production of these privileged documents, which the Defendants claim approaches in volume the entire body of exhibits (600) already identified, when the case is on the eve of trial, would have the potential to open a Pandora's box of new issues requiring additional discovery. Defendants claim they would likely need to depose other Dickenson Wright attorneys involved in the prior litigation or numerous client representatives, who communicated with their counsel in a privileged context, if Mr. Samborn is re-deposed and the privileged Dickenson Wright documents turned over to Plaintiff. On these facts, there is no justification to grant a grossly belated motion to compel discovery. While the court appreciates attempts at voluntary resolutions of discovery disputes, they should ideally occur before the cut-off date of discovery (and certainly not 18 months after) and before the filing of dispositive motions.

---

**6.** Even fully crediting Plaintiff's reasoning, Plaintiff admittedly found out about the significance of Mr. Samborn's testimony in the Defendants' October 2001 bifurcation brief. Yet, Suntrust did not file a motion to compel until May 2002—after the district court granted bifurcation. This seven month delay dilutes the strength of Suntrust's argument that it did not know about the significance of Mr. Samborn's testimony until the bifurcation brief. If this was the real reason, Suntrust presumably would have filed the present motion in October 2001.

Accordingly, for the reasons discussed above, Plaintiff's motion to preclude testimony, or alternatively compel discovery, is DENIED. Objections to this order must by must be filed by September 19, 2002, pursuant to Fed.R.Civ.P. 72(a) and 6(a) and (e), or may be deemed waived. Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.