RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 18a0182p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

HOWARD PITTMAN,

　　　　　　　　　*Plaintiff-Appellant*,

　　*v.*

EXPERIAN INFORMATION SOLUTIONS, INC., et al.,

　　　　　　　　　*Defendants*,

SERVIS ONE, INC., dba BSI Financial Services; ISERVE SERVICING, INC.,

　　　　　　　　　*Defendants-Appellees*.

> No. 17-1677

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:14-cv-13591—Victoria A. Roberts, District Judge.

Argued:  February 2, 2018

Decided and Filed:  August 23, 2018

Before:  BOGGS, CLAY, and DONALD, Circuit Judges.

---

## COUNSEL

**ARGUED:**  Edward A. Mahl, MICHIGAN CONSUMER CREDIT LAWYERS, Southfield, Michigan, for Appellant.  Christian K. Mullett, ORLANS PC, Troy, Michigan, for Appellee Servis One.  Mickey J. Lee, MAURICE WUTSCHER LLP, Indianapolis, Indiana, for Appellee iServe Servicing.  **ON BRIEF:**  Edward A. Mahl, MICHIGAN CONSUMER CREDIT LAWYERS, Southfield, Michigan, for Appellant.  Christian K. Mullett, ORLANS PC, Troy, Michigan, for Appellee Servis One.  Mickey J. Lee, MAURICE WUTSCHER LLP, Indianapolis, Indiana, for Appellee iServe Servicing.

---

**OPINION**

---

CLAY, Circuit Judge.  Plaintiff Howard Pittman ("Pittman") sued two mortgage servicers, iServe Servicing, Inc. ("iServe") and Servis One, Inc., d/b/a BSI Financial Services ("BSI"), for negligent and willful violation of the Fair Credit Reporting Act ("FCRA") pursuant to 15 U.S.C. §§ 1681n and 1681o.  He also sued BSI for breach of contract.  Pittman appeals from several decisions entered by the district court denying Pittman's motion for leave to file a second amended complaint, denying Pittman's motion to compel depositions of iServe representatives, granting iServe's motion for summary judgment and dismissing it from the case, and granting BSI's motion for summary judgment and dismissing the case.

For the reasons set forth below, we **AFFIRM in part** and **REVERSE in part** the district court's judgment and **REMAND** for proceedings consistent with this opinion.

**BACKGROUND**

I.     **Factual History**

On August 19, 2008, Pittman purchased a home located at 5930 Willow Road, West Bloomfield, Michigan 48324 with a $262,138.00 loan from Citicorp Trust Bank.  The loan is evidenced by a note and is secured by a mortgage.  The note requires that Pittman make monthly payments of $1,980.42 beginning on September 25, 2008.

On July 27, 2010, Citicorp assigned the loan to Pacifica.  From July 2010 until June 2012, iServe serviced the loan.  In June 2012, BSI began servicing the loan.[1]

Pittman failed to make two mortgage payments in August and September 2011.  Pittman then submitted a loan modification application to iServe.  In late 2011, iServe granted Pittman a

---

[1]We will refer to iServe and BSI collectively as "the Servicers."

Trial Modification Plan ("TPP")**2** on his mortgage, pursuant to the Home Affordable Mortgage Program ("HAMP"). Under the TPP, Pittman was to make "trial period payments in a timely manner" for January, February, and March 2012 in the amount of $1,357.80. (R. 90-1, TPP, PageID # 1739.) The TPP said "[a]fter all trial period payments are timely made and you have submitted all the required documents, your mortgage will be permanently modified." (*Id*.) Pittman made the three trial payments. Even though Pittman fully performed, the TPP was never made permanent in writing by iServe. However, Pittman continued to make the reduced monthly payments.

On May 31, 2012, Pittman received notice that the servicing of the loan had been assigned to BSI and that he was to send payments to BSI as of June 14, 2012.

On July 26, 2012, BSI sent Pittman a notice of default. Pittman sought the help of an attorney, Gilbert Borman, to assist him in making inquiries about the default and the loan modification to iServe and BSI. On January 17, 2013, Borman wrote to iServe that Pittman's "modification did not transfer over" from iServe to BSI and Borman was "informed by [a member of BSI's Loss Mitigation Department] that the reason the modification did not transfer over is that [iServe] did not properly report the modification to the Treasury Department." (R. 88-14, 1/17/13 Fax, PageID # 1603.) On January 30, 2013, iServe's Risk Manager emailed BSI's Loss Mitigation Department and said "[t]he borrower was on a trial modification with iServe in December 2011 and made all payments on time, contractually entitling him to a permanent mod [sic] in April 2012. iServe did not process the permanent modification prior to the loan being transferred to BSI on June 14, 2012." (R. 56, 1/30/13 Email, PageID # 885.) On April 25, 2013, Borman received an email from iServe's Senior Counsel stating that "[a]ccording to iServe's understanding from HAMP and BSI, Mr. Pittman's loan modification has been made permanent, so his concerns have been completely resolved." (R. 88-5, 4/25/13 Email, PageID # 1529.) During this time, BSI's Loss Mitigation Department told Pittman "to continue to make the trial payment amount." (R. 88-25, 3/16/13 Email, PageID # 1655.)

---

**2**The document itself is called a "Trial Modification Plan." However, the parties refer to the document as the "TPP" and not "TMP." TPP appears to stand for Trial Period Plan. We will use "TPP," as do the parties.

On June 4, 2014, Pittman obtained a credit report, which showed that both iServe and BSI had reported his mortgage payments as past due. On June 11, 2014, Pittman sent letters to the three major credit reporting agencies ("CRAs") disputing the information furnished by iServe and BSI. On August 20, 2014, Pittman again sent dispute letters to the three major CRAs. The complaints were referred to the Servicers for their investigation. The Servicers concluded that the loan payments were untimely as reported because there was no loan modification agreement and Pittman was not making the payments under the original contract.

Pittman also learned that BSI had not made property tax payments from his escrow account as required by the mortgage agreement. The amounts were $3,935.97 for 2013 and $2,355.50 for 2014.

## II.    Procedural History

On August 29, 2014, Pittman filed suit in the 48th District Court against Experian Information Solutions, Inc., Trans Union, LLC, Equifax Information Services, LLC, and BSI. He sued all Defendants for: (1) negligent violation of FCRA; and, (2) willful violation of FCRA. On September 16, 2014, the suit was removed to federal court.

On November 11, 2014, Pittman filed an amended complaint. The amended complaint added iServe as a defendant. Pittman again sued all Defendants for: (1) negligent violation of the FCRA; and, (2) willful violation of FCRA. He also sued BSI for breach of contract.

Upon stipulation of the parties, the claims against Trans Union, Experian, and Equifax were dismissed with prejudice and without fees or costs.

On January 9, 2015, Pittman filed a motion for leave to file a second amended complaint in order to add Pacifica as a party and to add additional counts. On February 25, 2015, Pittman filed an amended motion for leave to file a second amended complaint. On February 26, 2015, Pittman withdrew this motion. On June 24, 2015, the district court entered an order striking the amended motion for leave to file a second amended complaint because Pittman did not attach a copy of the second amended complaint to the motion and the court was not sure which complaint Pittman wanted to file. On June 29, 2015, Pittman filed a renewed motion for leave to file a

second amended complaint.  On November 9, 2015, Pittman filed a notice of withdrawal of his renewed motion.

On November 25, 2015, BSI filed a motion for judgment on the pleadings.  On November 30, 2015, iServe filed its answer to the amended complaint with affirmative defenses. On December 1, 2015, Pittman sent a notice of deposition to iServe.  On December 4, 2015, Pittman filed a motion to compel depositions of iServe's representatives.  On December 11, 2015, iServe filed a motion for judgment on the pleadings.  On January 18, 2016, Pittman filed a combined motion to consolidate cases and for leave to file a second amended complaint.

On May 11, 2016, the district court conducted a hearing on the pending motions.[3]  The district court ruled on the motions at the hearing and, on May 13, 2016, issued a written order denying both BSI's and iServe's motions for judgment on the pleadings, denying Pittman's motion to amend the complaint, and denying Pittman's motion to compel the depositions of iServe's representatives.  The district court granted Pittman's motion to consolidate cases, but later "unconsolidated[d]" the cases.  (R. 83, Order Unconsolidating Cases, PageID # 1418.)

On August 12, 2016, both Pittman and iServe filed motions for summary judgment. Pittman sought summary judgment on all of his claims.  iServe sought summary judgment on Pittman's claims against it.

On November 30, 2016, the district court denied Pittman's motion for summary judgment, granted iServe's motion for summary judgment, and dismissed iServe from the case. The district court found that the TPP was not a legally enforceable permanent modification agreement and that Pittman was barred under Michigan law from arguing estoppel.  The district court also found that Pittman failed on the threshold question of his FCRA claim—whether there was a reporting error.  The district court concluded that "[b]ecause the [TPP] was neither permanent nor enforceable, and because he was on notice that his credit score could be adversely affected during the trial period, Pittman cannot show iServe or BSI made an error in reporting his loan payments as overdue."  (R. 96, Order, PageID # 2380.)  Consequently, the district court

---

[3]This included Pittman's combined motion to consolidate cases and leave to file an amended complaint, BSI's motion for judgment on the pleadings, iServe's motion for judgment on the pleadings, and Pittman's motion to compel depositions of iServe representatives.

denied Pittman's motion for summary judgment and granted iServe's motion for summary judgment. Finally, the district court denied Pittman's motion for summary judgment on the breach of contract claim against BSI because a question of fact on a material issue remained— whether Pittman was the first to "materially" breach the contract.

On January 10, 2017, BSI filed a motion for leave to file a late motion for summary judgment and the motion for summary judgment itself. On January 11, 2017, BSI filed an amended motion for leave to file a motion for summary judgment and the motion for summary judgment itself. On January 31, 2017, the district court granted BSI's motion for leave to file a motion for summary judgment because of the findings associated with the November 30, 2016 order and because ruling on the motion "may prevent an unnecessary trial." (R. 104, Order Granting Leave, PageID # 2559–61.)

On May 19, 2017, the district court granted BSI's motion for summary judgment and dismissed the case. The district court noted that because Pittman could not show that the Servicers made an error in reporting his loan payments as overdue, BSI was entitled to summary judgment on Pittman's FCRA claim. With regard to the breach of contract claim, the district court found that Pittman breached the agreement by failing to make two monthly payments, and because of that "substantial" breach, Pittman could not "maintain an action against BSI for failure to perform." (R. 107, Order Granting BSI's MSJ, PageID # 2608.) Consequently, the district court concluded that BSI was entitled to summary judgment on Pittman's breach of contract claim. As a result, the district court dismissed the case.

On June 9, 2017, Pittman timely filed his notice of appeal.

## DISCUSSION

### I. Fair Credit Reporting Act

#### Standard of Review

This Court reviews a district court's grant of summary judgment *de novo*. *Gillis v. Miller*, 845 F.3d 677, 683 (6th Cir. 2017). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The moving party must demonstrate the "basis for its motion, and identify[] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323 (internal citations and quotation marks omitted). The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal citations and quotation marks omitted). The reviewing court must then determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. A court should view the facts and draw all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## Analysis

"Congress enacted FCRA in 1970 to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007). 15 U.S.C. § 1681s-2 outlines various responsibilities of "furnishers of information to consumer reporting agencies." This section was "designed to prevent 'furnishers of information' from spreading inaccurate consumer-credit information." *Boggio v. USAA Fed. Sav. Bank*, 696 F.3d 611, 614 (6th Cir. 2012).

FCRA imposes a duty on furnishers of information to provide complete and accurate information. 15 U.S.C. § 1681s-2(a). FCRA also imposes certain duties on furnishers of information upon notice of a dispute. 15 U.S.C. § 1681s-2(b). After receiving notice of a "dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency," that person shall:

(A) conduct an investigation with respect to the disputed information;

(B) review all relevant information provided by the consumer reporting agency pursuant to section 1681i(a)(2) of this title;

(C) report the results of the investigation to the consumer reporting agency;

(D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis; and

(E) if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1), for purposes of reporting to a consumer reporting agency only, as appropriate, based on the results of the reinvestigation promptly--

> (i) modify that item of information;

> (ii) delete that item of information; or

> (iii) permanently block the reporting of that item of information.

15 U.S.C. § 1681s-2(b)(1).

FCRA "expressly creates a private right of action to enforce many of its terms." *Boggio*, 696 F.3d at 615. Pursuant to § 1681s-2(c), however, consumers are precluded "from enforcing the requirement that furnishers, under § 1681s-2(a), initially provide complete and accurate consumer information to a CRA." *Id.* However, "FCRA expressly creates a private right of action against a furnisher who fails to satisfy one of five duties identified in § 1681s-2(b)." *Id.* at 618. A consumer is permitted to demonstrate that a furnisher negligently breached one of these duties, under § 1681o, or willfully breached one of them, under § 1681n. *Id.*

Under § 1681s-2(b)(1), iServe and BSI were required, "after receiving notice of a consumer dispute from a credit reporting agency, to conduct a reasonable investigation of their records to determine whether the disputed information can be verified." *Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426, 431 (4th Cir. 2004). There is no issue that Pittman notified the CRAs of his dispute, or that Experian and Equifax notified the Servicers of the dispute.[4] There is a question about whether the Servicers failed to reasonably investigate or rectify the disputed charge.

The district court never reached this question, however, because it reached only the "threshold question of whether there were reporting errors by iServe and BSI." (R. 96, Opinion, PageID # 2380.) The district court found that "an error is an essential part of a[] FCRA claim."

---

[4]We note that iServe disputes that it received notice from Trans Union.

(*Id.* (citing *Spence v. TRW, Inc.*, 92 F.3d 380, 382 (6th Cir. 1996).)  In *Spence*, this Court found that "[a] showing of inaccuracy is an essential element of a claim under the Fair Credit Reporting Act."  92 F.3d at 382 (citations omitted).  We note that *Spence* dealt with a claim under § 1681e(b),[5] *id.* at 381, but that several courts have required a showing of inaccuracy to succeed on a claim under § 1681s-2(b) as well.  *See Shaw v. Equifax Info. Sols., Inc.*, 204 F. Supp. 3d 956, 959 (E.D. Mich. 2016) ("Inaccuracy is an essential element of a claim for negligent or willful violation of the FCRA under section 1681s-2(b)." (citing *Spence*, 92 F.3d at 382)); *Bailey v. Equifax Info. Servs., LLC*, No. 13-10377, 2013 WL 3305710, at *9 (E.D. Mich. July 1, 2013) ("[T]he Court grants FIA's motion [to dismiss] [because] Plaintiff has failed to make factual allegations that support her claims that FIA reported inaccurate or misleading information or had unreasonable procedures."); *Nykoriak v. GMAC LLC*, No. 09-12490, 2010 WL 1923796, at *3 (E.D. Mich. May 12, 2010) (denying the plaintiff's motion for summary judgment because there was a genuine issue of material fact about whether the furnisher reported accurate information); *see also Chiang v. Verizon New Eng. Inc.*, 595 F.3d 26, 37–38 (1st Cir. 2010) ("The FCRA is intended to protect consumers against the compilation and dissemination of *inaccurate* credit information." (citation omitted)); *Wadley v. Ford Motor Credit Co.*, 397 F. Supp. 2d 781, 784 (E.D. Va. 2005) ("[T]he FCRA requires a showing that the entity reporting the debt furnished inaccurate information."); *Haynes v. Navy Fed. Credit Union*, 52 F. Supp. 3d 13, 19–20 (D.D.C. 2014) (the furnisher's report to credit agencies that the plaintiff was past due on his mortgage loan was accurate and, in the absence of other support, foreclosed plaintiff's FCRA claim).

We agree that a threshold showing of inaccuracy or incompleteness is necessary in order to succeed on a claim under § 1681s-2(b).  After all, as this Court has described, "Section 1681s-2 works in two phases.  Initially, furnishers have a duty to provide the CRAs with accurate information about their consumers.  Later, a furnisher may be asked by a CRA to respond to disputes about the consumer information provided."  *Boggio*, 696 F.3d at 614 (internal citation omitted).  And the requirement meets the goals of FCRA by preventing "'furnishers of information' from spreading *inaccurate* consumer-credit information."  *Id.* (emphasis added).

---

[5]Under § 1681e(b), a credit reporting agency is required to follow "reasonable procedures to assure maximum possible accuracy" of the information contained in a consumer's credit report, and a requirement for stating a claim is that the report contained inaccurate or incomplete information.

To meet this threshold showing, a plaintiff can show that the information provided is false or that it contains a material omission or creates a materially misleading impression. *Id*. at 617–18.

Turning to the threshold question in this case, the district court concluded that Pittman could not show that iServe and BSI "made an error in reporting his loan payments as overdue." (R. 96, Opinion, PageID # 2380; R. 107, Opinion, PageID # 2603–05.) This was because there was no enforceable permanent loan modification and because Pittman missed two payments, made smaller payments after the TPP, and never brought his account current.

We disagree with the district court that Pittman cannot make his initial showing of inaccurate or incomplete reporting. We think his FCRA claim can proceed for at least two reasons: (1) while there was no written permanent modification document, there may have been an enforceable agreement to modify his loan[6]; and, (2) the Servicers did not report the existence of the TPP.[7] We address these two reasons in turn.

### A.      Agreement to Permanently Modify the Loan

First, we think Pittman can show inaccurate reporting because the TPP was an offer for permanent modification, which Pittman accepted by satisfying the conditions contained in the TPP. Under Michigan law, "[a] valid contract requires five elements: (1) parties competent to contract, (2) a proper subject matter, (3) legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation." *Bank of Am., NA v. First Am. Title Ins. Co.*, 878 N.W.2d 816, 830 (Mich. 2016) (citation omitted). "Before a contract can be completed, there must be an offer and acceptance." *Pakideh v. Franklin Commercial Mortg. Grp., Inc.*, 540 N.W.2d 777, 780 (Mich. Ct. App. 1995).

---

[6]iServe argues that Pittman waived this argument by raising it for the first time on appeal. (The correct term for iServe's argument is "forfeiture," not "waiver.") We disagree. Pittman argues throughout his pleadings relating to the motions for summary judgment that he had been granted a TPP, that he fully performed the TPP, and that because of his compliance with the TPP, his loan modification should have been made permanent by iServe. Consequently, we think Pittman sufficiently raised this argument to the district court.

[7]iServe argues that Pittman [forfeited] the argument that Servicers should have reported the TPP to the credit reporting agencies by raising it for the first time on appeal. Again, we disagree. Pittman's entire argument is that the Servicers misrepresented the state of his debt because of the TPP. Part of this argument is that the Servicers did not acknowledge the existence of or the consequences of the TPP to the CRAs and incorrectly reported "the status of the account." (R. 88, Pittman MSJ, PageID # 1448–56.) Consequently, we think Pittman sufficiently raised this argument to the district court.

The TPP said that to accept the trial period plan under HAMP, Pittman needed to make three "trial period payments in a timely manner." (R. 92-4, TPP, PageID # 2184.)  It provided that "[t]his is the first step toward qualifying for more affordable mortgage payments." (*Id.*)  It said, "[a]fter all trial period payments are timely made and you have submitted all the required documents, your mortgage will be permanently modified. (Your existing loan and loan requirements in effect and unchanged during the trial period.)" (*Id.*)  It was signed "Sincerely, Loss Mitigation Department, iServe Servicing Inc." (*Id.*)

Attached to the TPP was a document entitled "Frequently Asked Questions." (*Id.* at # 2185.)  It included statements like "If your loan is modified, we will waive all unpaid late charges," "Your credit score may be adversely affected by accepting a trial period plan," and "The trial period is temporary, and your existing loan and loan requirements remain in effect and unchanged during the trial period." (*Id.*)  The FAQs contained the question: "When will I know if my loan can be modified permanently and how will the modified loan balance be determined?" (*Id.*)  It answered: "Once you make all of your trial period payments on time, we will send you a modification agreement detailing the terms of the modified loan." (*Id.*)  The TPP also included "Additional Trial Period Plan Information and Legal Notices." (*Id.* at # 2187.)  It said: "The servicer's acceptance and posting of your new payment during the trial period will not be deemed a waiver of the acceleration of your loan (or foreclosure actions) and related activities, and shall not constitute a cure of your default under your loan unless such payments are sufficient to completely cure your entire default under your loan." (*Id.*)  Finally, it said: "You agree that all terms and provisions of your current mortgage note and mortgage security instrument remain in full force and effect and you will comply with those terms; and that nothing in the trial period plan shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the loan documents." (*Id.*)

Under the terms of the TPP, the original loan remained in effect.  The TPP set forth the terms of the trial period, and said that a final agreement would be set forth in a separate modification agreement to be sent to Pittman after timely making the payments and submitting all requested documentation.  The TPP did not itself permanently modify the terms of the loan

and was not itself a permanent loan modification agreement. No permanent loan modification agreement was ever reduced to writing between Pittman and the Servicers.

However, courts have considered whether TPPs are enforceable agreements to modify a borrower's loan. For example, the Seventh Circuit considered whether the plaintiff "stated claims under Illinois law against her home mortgage servicer for refusing to modify her loan pursuant to the federal Home Affordable Mortgage Program (HAMP)." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 554 (7th Cir. 2012). In *Wigod*, the plaintiff was issued a trial loan modification "under which [the servicer] agreed to permanently modify the loan if she qualified under HAMP guidelines." *Id*. Wells Fargo argued that the "TPP was not an enforceable offer to permanently modify [the plaintiff's] mortgage because it was conditioned on Wells Fargo's further review of her financial information to ensure she qualified under HAMP." *Id*. at 561. The Court disagreed, and said:

> [T]he TPP spelled out two conditions precedent to Wells Fargo's obligation to offer a permanent modification: [the plaintiff] had to comply with the requirements of the trial plan, and her financial information had to remain true and accurate. But these were conditions to be satisfied by the promisee ([plaintiff]) rather than conditions requiring further manifestation of assent by the promisor (Wells Fargo). These conditions were therefore consistent with treating the TPP as an offer for permanent modification.

*Id*. at 562. The court also found sufficient consideration and found the terms sufficiently definite and certain. *Id.* at 563–65. "Before these conditions were met, the loan documents remained unmodified and in force, but under . . . the TPP, Wells Fargo still had an obligation to *offer* [the plaintiff] a permanent modification once she satisfied all her obligations under the agreement." *Id*. at 563; *see also Oskoui v. J.P. Morgan Chase Bank, N.A.*, 851 F.3d 851, 859 (9th Cir. 2017) ("Once [the plaintiff] made her three payments, Chase was obligated by the explicit language of its offer [in the TPP] to send her *an Agreement* for her signature 'which will modify the loan as necessary to reflect this new payment amount.' . . . Chase must abide by its own language."); *George v. Urban Settlement Servs.*, 833 F.3d 1242, 1260 (10th Cir. 2016) ("[W]e conclude that the language in BOA's TPP documents clearly and unambiguously promises to provide permanent HAMP loan modifications to borrowers who comply with the terms of their TPPs."); *Young v. Wells Fargo Bank, N.A.*, 717 F.3d 224, 234 (1st Cir. 2013) (finding "[t]he TPP's plain

terms therefore required Wells Fargo to offer her a permanent modification," where the TPP provided that if plaintiff made timely payments, provided any necessary information, and truthfully represented her financial situation, the lender "will" send her a "Modification Agreement for her signature which *will* modify her Loan Documents"); *Corvello v. Wells Fargo Bank, NA*, 728 F.3d 878, 883 (9th Cir. 2013) (finding that "the bank was contractually obligated under the terms of the TPP to offer a permanent modification to borrowers who complied with the TPP by submitting accurate documentation and making trial payments"). We find the reasoning of the First, Seventh, Ninth, and Tenth Circuits persuasive.

Courts within this circuit have also considered this question but have come to varying conclusions. *See Williams v. Saxon Mortg. Servs., Inc.*, No. 13-10817, 2014 WL 765055, at *2 (E.D. Mich. Feb. 26, 2014) (finding that the TPP obligated the defendant to modify the plaintiffs' loan because the TPP said it would "modify Plaintiffs' loan if Plaintiffs complied with the terms of the trial period and if all of Plaintiff's representations about their financial situation continued to be true at the end of the trial period"); *Bolone v. Wells Fargo Home Mortg., Inc.*, 858 F. Supp. 2d 825, 833–34 (E.D. Mich. 2012) (finding that "Wells Fargo's obligation to provide Plaintiff a permanent loan modification is contingent on whether Plaintiff provided [the requested proof of income] documents" and that there was a genuine dispute of fact as to whether plaintiff submitted those documents). *But see Goss v. ABN AMRO Mortg. Grp.*, 549 F. App'x 466, 471 (6th Cir. 2013) (finding the "TPP did not furnish [plaintiff] with a promise that CMI would modify his loan" because "he acknowledged that the TPP did not constitute a promise that his mortgage and note would be modified" and the TPP "was only an application for an offer to modify the loan agreement, provided certain conditions were met"); *Polk v. Countrywide Fin. Corp.*, No. 12-10648, 2012 WL 2952389, at *3–4 (E.D. Mich. July 19, 2012); *Fed. Home Loan Mortg. Corp. v. Hassell*, No. 11-14564, 2013 WL 823241, at *6 (E.D. Mich. Mar. 6, 2013) (finding that the TPP did not promise the loan would be modified because "the language of the Trial Plan expressly provides that the Trial Plan is not a loan modification and Plaintiff's loan documents would not be modified 'unless and until' Plaintiff met all the conditions for modification, including providing Wells Fargo all requested documentation. Moreover, when Plaintiff signed the Trial Plan, she acknowledged that it did not promise that her mortgage and

note would be modified."); *Heikkinen v. Bank of Am., N.A.*, No. 11-12532, 2012 WL 628608, at *6 (E.D. Mich. Feb. 27, 2012).

In this case, we find that the TPP contained an offer to permanently modify Pittman's mortgage if Pittman made timely payments and provided required documentation. The TPP said "[t]o qualify for a permanent modification, you must make the following trial period payments in a timely manner." (R. 92-4, TPP, PageID # 2184.) It said, "[a]fter all trial period payments are timely made and you have submitted all the required documents, your mortgage *will* be permanently modified." (*Id.* (emphasis added).) The FAQs also provided, "[o]nce you make all of your trial period payments on time, we *will* send you a modification agreement detailing the terms of the modified loan." (*Id.* at # 2185 (emphasis added).) This is all mandatory language. *See Young*, 717 F.3d at 235. We think the TPP contained a clear and unambiguous promise by iServe to offer Pittman a permanent modification, if Pittman timely made his payments and sent requested documentation.

As explained in *Wigod*, it is not a problem that there were conditions precedent to the Servicers' obligation to offer the permanent modification because they were conditions to be satisfied by Pittman and not "conditions requiring further manifestation of assent" by iServe. 673 F.3d at 561–62 (citing 1 Richard A. Lord, *Williston on Contracts* § 4:27 (4th ed. 2011) ("[A] condition of subsequent approval by the promisor in the promisor's sole discretion gives rise to no obligation. . . . However, the mere fact that an offer or agreement is subject to events not within the promisor's control . . . will not render the agreement illusory.")).

After iServe made this offer to provide a permanent modification conditioned on Pittman's timely payment, Pittman accepted the offer by performing in accordance with its terms. This was a unilateral contract. *Polaris Const., Inc. v. Delicata*, No. 322094, 2015 WL 7283213, at *7 (Mich. Ct. App. Nov. 17, 2015) (describing a unilateral contract as one in which "the promisor makes an offer or promise that the promisee accepts by performing the act upon which the promise is based"). Pittman timely made those three monthly payments as required by the TPP. There is no allegation that he failed to send the requested documentation. Pittman, then, accepted iServe's offer in strict conformity with that offer. *Pakideh*, 540 N.W.2d at 780.

We also find that the agreement does not fail as an agreement to agree. "A contract to make a subsequent contract is not per se unenforceable; in fact, it may be just as valid as any other contract." *Opdyke Inv. Co. v. Norris Grain Co.*, 320 N.W.2d 836, 838 (Mich. 1982) (citing 1 Corbin, Contracts, § 29, p. 84). However, "[t]o be enforceable, a contract to enter into a future contract must specify all its material and essential terms and leave none to be agreed upon as the result of future negotiations." *Heritage Broad. Co. v. Wilson Commc'ns, Inc.*, 428 N.W.2d 784, 787 (Mich. Ct. App. 1988). "[T]he lack of non-essential terms does not automatically invalidate the agreement." *Trapp v. Vollmer*, No. 297116, 2011 WL 2423884, at *1 (Mich. Ct. App. June 16, 2011). "[A]n agreement may be enforced as a contract even though incomplete or indefinite in the expression of some terms, if it is established that the parties intended to be bound by the agreement, particularly where one or another of the parties has rendered part or full performance." *J.W. Knapp Co. v. Sinas*, 172 N.W.2d 867, 869 (Mich. Ct. App. 1969). The open terms must be capable of being determined "independent of a party's mere 'wish, will, and desire' . . . , either by virtue of the agreement itself or by commercial practice or other usage or custom." *Wigod*, 673 F.3d at 565 (quoting 1 Arthur Linton Corbin, *Corbin on Contracts* § 95, at 402 (1960 ed.)). "This may be the case, even though the determination is left to one of the contracting parties, if he is required to make it 'in good faith' in accordance with some existing standard or with facts capable of objective proof." *Id.* (quoting *Corbin*, at 402).

In this case, the TPP provided that the trial period payment "is approximately 31% of [Pittman's] total gross monthly income, which [iServe] determined based upon the income documentation [Pittman] provided." (R. 90-1, TPP, PageID # 1740.) As a result of the 31% benchmark, iServe came up with the trial payment figure of $1,357.80. The TPP provided that the "new payment also will be based on 31% of your gross income." (*Id.* at # 1740.) It said that if Pittman's existing payment included mortgage insurance premiums, that amount would be added to the payment. The TPP provided that "[a]ny difference between the amount of the trial period payments and your regular mortgage payments will be added to the balance of your loan along with any other past due amounts as permitted by your loan documents." (*Id.*) It continued, "[w]hile this will increase the total amount that you owe, it should not significantly change the amount of your modified mortgage payment as that is determined based on your total monthly gross income, not your loan balance." (*Id.*) The TPP also included details about the interest rate

and monthly principal and interest payment after permanent modification, and that these would be fixed for the life of the mortgage.

While the TPP did not contain the exact figure that would be contained in a permanent modification agreement, it does not fail for indefiniteness. The TPP provided enough information and guidance for how iServe would calculate the figure and provided a temporary figure that was based on the same formula. The ultimate figure was not left to iServe's unfettered discretion. And there were no essential terms left to be negotiated in the future by the parties. The court in *Wigod* faced a similar question because the "trial period terms were an 'estimate' of the terms of the permanent modification and [] Wells Fargo had some limited discretion to modify permanent terms based on its determination of the 'final amounts of unpaid interest and other delinquent amounts.'" 673 F.3d at 564. However, it found that the TPP was not a "mere 'agreement to agree'" because the HAMP guidelines provided the "'existing standard' by which the ultimate terms of Wigod's permanent modification were to be set" and that "Wells Fargo was obligated to use the NPV test and the waterfall method to try to bring [the plaintiff's] monthly payments down to 31 percent of her gross income." *Id*. at 564–65. Because Pittman entered the TPP pursuant to HAMP, this argument applies here as well. We think the terms of the TPP are clear and definite enough to constitute an enforceable contract.

In sum, we find that the TPP provided that iServe was required to send Pittman a modification agreement offering to modify his loan once he met the conditions provided in the TPP. Because Pittman followed the requirements of the TPP, iServe's obligation kicked in, and it "could not unilaterally and without justification refuse to send the offer." *Corvello*, 728 F.3d at 883–84. iServe could not avoid its obligations to Pittman "merely by choosing not to send" a modified agreement when Pittman made the required payments and otherwise complied with the TPP's requirements of him. *Id*. at 883.

Although we find there was an agreement to modify Pittman's loan, we next consider whether the agreement satisfies the statute of frauds. "Under Michigan's statute of frauds, a financial institution's promise regarding financial accommodation, like a loan modification, is void unless it is (1) in writing and (2) signed with an authorized signature by the party to be

charged with the promise." *Trombley v. Seterus Inc.*, 614 F. App'x 829, 832 (6th Cir. 2015) (citing MICH. COMP. LAWS § 566.132(2)(c)). Michigan law provides:

> An action shall not be brought against a financial institution to enforce any of the following promises or commitments of the financial institution unless the promise or commitment is in writing and signed with an authorized signature by the financial institution:
>
> > (a) A promise or commitment to lend money, grant or extend credit, or make any other financial accommodation.
> >
> > (b) A promise or commitment to renew, extend, modify, or permit a delay in repayment or performance of a loan, extension of credit, or other financial accommodation.
> >
> > (c) A promise or commitment to waive a provision of a loan, extension of credit, or other financial accommodation.

MICH. COMP. LAWS § 566.132(2).

The agreement to modify Pitman's loan was contained in a writing—the TPP. The question is whether the TPP containing the offer to modify was "signed with an authorized signature by the financial institution." "State and federal courts . . . have consistently held that an action to enforce a mortgage modification lacking an authorized signature [is] barred under the statute of frauds." *Trombley*, 614 F. App'x at 833–34 (citing *Huntington Nat'l Bank v. Daniel J. Aronoff Living Tr.*, 853 N.W.2d 481, 489–90 (Mich. Ct. App. 2014)).

Whether a contract is "signed" depends on whether the party intended to authenticate the writing. *See Jim-Bob, Inc. v. Mehling*, 443 N.W.2d 451, 458 (Mich. Ct. App. 1989). And whether a person intended to authenticate a writing is a question of fact. *Id*. ("Whether the party possessed the intent to authenticate is a question of fact."); *Clark v. Coats & Suits Unlimited*, 352 N.W.2d 349, 354 (Mich. Ct. App. 1984). "[A]ny symbol executed or adopted by a party with the present intent to authenticate a writing may serve as a signature." *Jim-Bob, Inc.*, 443 N.W.2d at 458. In this case, at the end of the TPP is a typewritten line that reads: "Sincerely, Loss Mitigation Department iServe Servicing Inc." The TPP gives no indication that iServe intended an additional signature by one of its representatives. The TPP was sent to Pittman on iServe's behalf and by the department that was in a position to offer loss mitigation

alternatives, like the one at issue in this case. We think these facts are sufficient to raise a genuine issue for trial as to whether the typewritten line was intended to authenticate the TPP.

We note that courts in this circuit have ruled inconsistently on whether the phrase "Sincerely, [Servicer Name]" is sufficient to satisfy the "authorized signature" requirement of the statute of frauds. The federal courts within this circuit have been split on this issue.[8] And although the Michigan Supreme Court has not yet weighed in, two Michigan Courts of Appeals have held that the typefaced name of a financial institution does not satisfy the "authorized signature" requirement of the statute of frauds. *See Rodgers v. JPMorgan Chase Bank NA*, 890 N.W.2d 381, 385 (Mich. Ct. App. 2016) (holding that a TPP that included "Sincerely, Ocwen Loan Servicing, LLC" was not "signed with an authorized signature"); *Terry v. Fed. Nat'l Mortg. Ass'n*, No. 321141, 2015 WL 4546570, at *3 (Mich. Ct. App. July 28, 2015) (holding that a TPP with a signature block labeled "JP Morgan Chase Bank, N.A." was "not signed by one of Chase's authorized agents").

Nonetheless, it is our task to try to make sense of the case law and to "apply state law in accordance with the controlling decisions of the highest court of the state," *Meridian Mut. Ins. Co. v. Kellman*, 197 F.3d 1178, 1181 (6th Cir. 1999) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)), which is the Michigan Supreme Court, *Dinsmore Instrument Co. v. Bombardier, Inc.*, 199 F.3d 318, 320 (6th Cir. 1999). Where the Michigan Supreme Court has not addressed the issue, we "must attempt to ascertain how that court would rule if it were faced with the issue." *Meridian Mut. Ins. Co.*, 197 F.3d at 1181. "The Court may use the decisional law of the state's lower courts, other federal courts construing state law, restatements of law, law review commentaries, and other jurisdictions on the 'majority' rule in making this determination." *Id.* (citing *Grantham & Mann v. American Safety Prods.*, 831 F.2d 596, 608 (6th Cir. 1987)). However, the Court "should not disregard the decisions of intermediate appellate state courts

---

[8]*See Trombley*, 614 F. App'x at 832 n.2 ("We presume that the phrase 'Sincerely, IBM Lender Business Process Services, Inc.' was intended as a 'signature' of the cover letter by Seterus."); *Polk v. Countrywide Fin. Corp.*, No. 12-10648, 2012 WL 2952389, at *3 (E.D. Mich. July 19, 2012) ("The closing of the trial modification letter reads: 'Loan Modification Team, Bank of America Home Loan Servicing, LP.' This could arguably satisfy the statutory requirement of 'an authorized signature by the financial institution.'"). *But see Super v. Seterus, Inc.*, No. 13-CV-11626, 2014 WL 902827, at *3 (E.D. Mich. Mar. 7, 2014); *Badger v. Fed. Nat. Mortg. Ass'n*, No. 12-13416, 2013 WL 4805512, at *6 (E.D. Mich. Sept. 9, 2013); *Rummell v. Vantium Capital, Inc.*, No. 12-10952, 2012 WL 2564846, at *6 (E.D. Mich. July 2, 2012).

unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Id.* (citing *Commissioner v. Estate of Bosch*, 387 U.S. 456, 465 (1967)).

The cases from the Michigan Court of Appeals conclude that a typed entity-servicer's name is insufficient to satisfy the statute of frauds, suggesting that the court of appeals believes the documents in question must contain the personal signature of an individual authorized agent of the financial institution.  However, we are convinced that the Michigan Supreme Court would conclude that "signed with an authorized signature by the financial institution" does not mean signed with the personal signature of an individual authorized agent.  And to the extent that the Michigan Court of Appeals has made a personal signature a requirement, we think the Michigan Court of Appeals has "graft[ed] an unjustifiable requirement onto the Michigan statute," *Etts v. Deutsche Bank Nat'l Tr. Co.*, 126 F. Supp. 3d 889, 906 (E.D. Mich. 2015), with which the Michigan Supreme Court would not agree.

First, to adopt this requirement would "torture [the statute's] language."  *Id.*  Section 566.132(2) requires that the writing be "signed with an authorized signature by the financial institution."  Nowhere in the statute does this suggest that an individual must sign, or that an individual must sign with a handwritten signature.  *PIC Maint., Inc. v. Dep't of Treasury*, 809 N.W.2d 669, 674 (Mich. Ct. App. 2011) ("[W]e will not read words into the plain language of the statute."); *People v. Carey*, 170 N.W.2d 145, 147 (Mich. 1969) ("The Court can only give full effect to the plain meaning of the term as used in the statute and cannot read into the law a requirement that the law-making body has seen fit to omit."); *In re Hurd-Marvin Drain*, 50 N.W.2d 143, 146 (Mich. 1951) ("We may not read into the law a requirement that the law making body has seen fit to omit.").  Instead, the statute requires only that there be a signature by someone who has the authority to sign for the financial institution.

Additionally, "insisting on a personal signature would depart markedly from the long history of the statute of frauds under which a 'signature' could include any notation signifying adoption or assent to being bound." *Etts*, 126 F. Supp. 3d at 907 (citing 4 Corbin, Contracts § 23.4, pp. 789–798; 72 Am. Jur. 2d *Statute of Frauds* § 257; Restatement (Second) of Contracts § 134 (1979); MICH. COMP. LAWS § 440.1201(2)(kk)).  Traditionally, "any symbol executed or adopted by a party with the present intent to authenticate a writing may serve as a signature."

*Jim-Bob, Inc.*, 443 N.W.2d at 458; *see also Clark*, 352 N.W.2d 349 at 354 ("[A] typewritten name [like 'From Ted Goldsmith'] may satisfy the signature requirement of the statute of frauds as long as the party typing his or her name intends to authenticate same." (citing 2 Corbin, Contracts, § 522, pp. 768–769)). "While the statute of frauds for financial institutions was meant to broaden the *kinds of promises* that had to be in writing, nothing in the wording of the statute suggests that the standards for determining whether there was a *sufficient signature* had been made more stringent." *Etts*, 126 F. Supp. 3d at 907; *see also Huntington Nat'l Bank*, 853 N.W.2d at 491 ("By referring to a promise or commitment that is itself in writing and signed, the Legislature plainly intended to limit enforcement to a promise or commitment that was actually made."). For example, the ordinary statute of frauds requires that agreements be "in writing and signed with an authorized signature by the party to be charged with the agreement, contract or promise," MICH. COMP. LAWS § 566.132(1), whereas the statute of frauds for financial institutions requires that agreements be "in writing and signed with an authorized signature by the financial institution," *Id*. § 566.132(2). We see no reason to treat these two signature requirements differently.

Further, we think that adopting a more stringent standard for signatures of financial institutions would produce unjust results. "Consumers and seasoned merchants alike are used to being tendered documents containing promises—such as form contracts, warranties, quotes and invoices—that close with only a printed company name, rather than the personal handwritten signature of an individual." *Etts*, 126 F. Supp. 3d at 908. Requiring an individual or handwritten signature would "mean that lenders could make detailed promises to customers and affix the lender's name, and deceive even the most sophisticated customer into believing that an enforceable promise had been made and could be relied upon." *Id*.

We do not believe that the Michigan legislature meant to allow a lender to escape liability for its promises by "having an authorized representative affix the typewritten name of the servicer-institution—rather than the handwritten name of the representative himself or herself— below the word 'Sincerely.'" *Id*. "This recipe for ensnaring the unwary would convert the statute of frauds into a statute *for* frauds, and undermine its fundamental purpose of 'preventing fraud or an opportunity for fraud.'" *Id*. (quoting *Kent v. Bell*, 132 N.W.2d 601, 605 (Mich.

1965)); *see also FEI Co. v. Republic Bank, S.E.*, No. 268700, 2006 WL 2313612, at *2 (Mich. Ct. App. Aug. 10, 2006) ("The statute of frauds exists for the purpose of preventing fraud or the opportunity for fraud, and not as an instrumentality to be used in the aid of fraud or prevention of justice." (citation omitted)).

Finally, we increasingly see important documents transmitted without a live or handwritten signature. And the law has begun to recognize this reality. *See* MICH. COMP. LAWS §§ 450.831–49 (authorizing and providing the terms and conditions under which information and signatures can be transmitted, received, and stored by electronic means); 15 U.S.C. § 7001(a)(1) ("[A] signature, contract, or other record relating to such transaction may not be denied legal effect, validity, or enforceability solely because it is in electronic form[.]").

In all, we think that a typewritten name of a financial institution can satisfy the signature requirement of the statute of frauds so long as the party typing the institution's name intends to authenticate the document and is authorized to do so. Because there is an issue of fact as to whether iServe intended to authenticate the TPP with the authorized signature of a person authorized to sign the document, we remand this question to the district court. If Pittman can show that there was indeed an enforceable agreement to modify his loan and that the Servicers were supposed to send him a permanent loan modification but instead reported him to the CRAs as being behind on his loan, then Pittman could make the threshold showing of inaccuracy required for a FCRA claim.

### B.     Failure to Report the TPP

Second, we think Pittman can show incomplete reporting on the part of the Servicers because Pittman had been granted a TPP and the Servicers did not report the existence of the TPP.

The HAMP program issues a "Handbook for Servicers of Non-GSE Mortgages." MAKING HOME AFFORDABLE PROGRAM, HANDBOOK FOR SERVICERS OF NON-GSE MORTGAGES, Version 3.1 (2011).[9] Under § 12.2 "Credit Bureau Reporting," the handbook says "[s]ervicers

---

[9]This version can be found at:

should report a 'full file' status report to the credit reporting agencies for each loan under HAMP in accordance with the Fair Credit Reporting Act." *Id.* at 97. "Full file" means that the "servicer must describe the exact status of each mortgage it is servicing as of the last business day of each month." *Id.* The handbook contains a section on "Trial Period Reporting," under § 12.2.1. *Id.* Within that section, the handbook provides that:

> If the borrower was delinquent (at least 30 days past the due date) prior to the trial period and the reduced payments do not bring the account current, servicers must report the Account Status Code that reflects the appropriate level of delinquency following the usual and customary reporting standards. The servicer reports the modification when it is completed as well. The servicer should also report Special Comment Code 'AC' (Paying under a partial or modified payment agreement).

*Id.* If the borrower is current with payments before the trial period, the handbook provides that the servicer "must report the borrower as current . . . during the trial period and report Special Comment Code 'AC.'" *Id.*

The credit reporting data does not reflect that the Servicers reported the existence of the TPP, which would be reflected by a special comment code under which Pittman was paying pursuant to a partial or modified payment agreement.

On this point, the Servicers rely on the distinction between "must" and "should," and argue that the HAMP guidelines encouraged, but did not require that they report Pittman's TPP. We acknowledge the difference between the language in the guidelines when a borrower is delinquent and when a borrower is current.

However, apart from these guidelines, under FCRA, we initially ask about the completeness and accuracy of the reporting. And failing to report the existence of the TPP constitutes incomplete reporting. Reporting that Pittman was delinquent on his loan payments without reporting the TPP implies a much greater degree of financial irresponsibility than was present here. And the existence of and Pittman's compliance with the terms of the TPP is relevant information about the status of his mortgage loan. Without this information, the Servicers' reporting was incomplete. Consequently, we think the district court erred in

---

https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/mhahandbook_31.pdf

concluding that Pittman lost at the "threshold question of whether there were reporting errors by iServe and BSI." (R. 96, Opinion, PageID # 2380.)

Because Pittman can meet the threshold showing necessary for a FCRA claim, the district court should have gone on to consider the reasonableness of the Servicers' investigations and the duties under § 1681s-2(b). Because both of the Servicers knew about the TPP and because Pittman has produced a number of emails by and between the Servicers admitting that Pittman should have received a permanent modification, we think there is a genuine issue of material fact as to whether the Servicers conducted a reasonable investigation to determine whether the disputed information could be verified. This seems especially true where the evidence suggests that the Servicers knew or should have known that the information was being reported inaccurately. *See Jett v. Am. Home Mortg. Servicing, Inc.*, 614 F. App'x 711, 713–14 (5th Cir. 2015) ("American Home knew that Jett's information was being reported inaccurately . . . ."). As a result, the question of reasonableness of the investigations is a question for the trier of fact to resolve. *Nykoriak*, 2010 WL 1923796, at *3. Consequently, we reverse the district court's grant of iServe's and BSI's motions for summary judgment and remand the case to the district court.

## II.     Substantial Breach of the Loan Agreement

### Standard of Review

This Court reviews a district court's grant of summary judgment *de novo*. *Gillis*, 845 F.3d at 683 (citation omitted). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

### Analysis

Under Michigan law, "[h]e who commits the first substantial breach of a contract cannot maintain an action against the other contracting party for failure to perform." *Ehlinger v. Bodi Lake Lumber Co.*, 36 N.W.2d 311, 316 (Mich. 1949) (quoting *Jones v. Berkey*, 148 N.W. 375, 378 (Mich. 1914)). The "determining factor" in any case is "whether a first breach is

'substantial.'" *Chrysler Int'l Corp. v. Cherokee Exp. Co.*, 134 F.3d 738, 742 (6th Cir. 1998). "[T]he words 'substantial breach' in the ruling must be given close scrutiny." *McCarty v. Mercury Metalcraft Co.*, 127 N.W.2d 340, 343 (Mich. 1964).

> Such scrutiny discloses that the application of such a rule can be found only in cases where the breach has effected such a change in essential operative elements of the contract that further performance by the other party is thereby rendered ineffective or impossible, such as the causing of a complete failure of consideration or the prevention of further performance by the other party.

*Id.* (internal citations omitted).

In *Jawad v. Hudson City Savings Bank*, the plaintiffs sued their mortgage servicer for, among other things, breach of contract for failing to follow contractual notice provisions prior to the acceleration of their mortgage. 636 F. App'x 319, 321 (6th Cir. 2016). The district court ruled that the plaintiffs were barred from alleging breach of contract against their mortgage servicer because they substantially breached the contract first by failing to make an unspecified number of mortgage payments. *Id.* at 322. This Court disagreed and found that "falling behind on their mortgage payments was not a substantial breach." *Id.* The Court noted that the notice provision expressly contemplated breach by the plaintiff and provided that "if plaintiffs breached the contract, the banks would provide notice prior to acceleration." *Id.* "[P]laintiffs' missed payments did not render notice of acceleration ineffective or impossible." *Id.* "A breach contemplated by the language of the contract is unlikely to render performance impossible, especially when the contract provides for a contingency in the event of that breach." *Id.*

Here, as in *Jawad*, falling behind on mortgage payments does not constitute a substantial breach. The mortgage itself contemplated default in multiple places and provided for what could occur in the event of breach. Additionally, the mortgage provisions regarding property taxes and escrow provided procedures for various contingencies, including for when deficient funds are held in escrow. Pittman's two missed payments in 2011 did not render BSI's placement of funds into escrow to pay property taxes for 2013 and 2014 ineffective or impossible. It also did not cause a complete failure of consideration or prevent further performance by BSI. BSI continued to accept Pittman's monthly payments and at no point did BSI initiate mortgage foreclosure proceedings.

Because we do not believe Pittman's two missed payments constitute a substantial breach, Michigan's first substantial breach rule does not prevent Pittman from bringing a breach of contract claim against BSI. Consequently, we reverse the district court's grant of BSI's motion for summary judgment on Pittman's breach of contract claim and remand the claim to the district court.

**III.      Motion to File an Amended Complaint**

### Standard of Review

The denial of Pittman's motion for leave to amend his complaint is reviewed under an abuse of discretion standard. *Ziegler v. Aukerman*, 512 F.3d 777, 786 (6th Cir. 2008). An abuse of discretion occurs when the district court "relies on clearly erroneous findings of fact, or when it improperly applies the law or uses an erroneous legal standard." *Adcock-Ladd v. Sec'y of Treasury*, 227 F.3d 343, 349 (6th Cir. 2000) (citation omitted).

### Analysis

Leave to amend should be "freely" granted "when justice so requires." Fed. R. Civ. P. 15(a)(2). "In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'" *Foman v. Davis*, 371 U.S. 178, 182 (1962). While "the grant or denial of an opportunity to amend is within the discretion of the District Court," "outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion," but "abuse of that discretion and inconsistent with the spirit of the Federal Rules." *Id*.

"Although Rule 15(a) indicates that leave to amend shall be freely granted, a party must act with due diligence if it intends to take advantage of the Rule's liberality." *United States v. Midwest Suspension & Brake*, 49 F.3d 1197, 1202 (6th Cir. 1995) (citation omitted). This Court "has required 'at least some significant showing of prejudice' to deny a motion to amend based solely upon delay." *Prater v. Ohio Educ. Ass'n*, 505 F.3d 437, 445 (6th Cir. 2007) (citation

omitted).  "The longer the period of an unexplained delay, the less will be required of the nonmoving party in terms of a showing of prejudice." *Phelps v. McClellan*, 30 F.3d 658, 662 (6th Cir. 1994) (citation omitted).

In *Siegner v. Twp. of Salem*, the Court found no abuse of discretion where a month had passed after the dispositive motion cut-off date and nearly two months had passed after the close of discovery, and where the plaintiff was long aware of the basis for the claim to be amended. 654 F. App'x 223, 228–29 (6th Cir. 2016).  The Court said "[a]llowing an amendment after discovery is closed and summary judgment motions are 'fully briefed' imposes significant prejudice on defendants." *Id*. at 228.  In *Duggins v. Steak 'N Shake, Inc.*, the Court found no abuse of discretion where the plaintiff was aware of the basis of the claim, but provided no justification for the delay, and where discovery had closed, the dispositive motion deadline had passed, and a motion for summary judgment had been filed.  195 F.3d 828, 834 (6th Cir. 1999). The Court said "allowing amendment after the close of discovery creates significant prejudice." *Id*.  In *Holland v. Metro. Life Ins. Co.*, the Court said "[w]here discovery is completed, the burden imposed on the defendant by allowing an amendment is greater, since the defendant likely will have begun trial preparation based on the issues aired in the discovery process."  869 F.2d 1490, at \*2 (6th Cir. 1989); *see also Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 459 (6th Cir. 2001).

The district court did not abuse its discretion in denying Pittman's motion for leave to file a second amended complaint.  On November 10, 2014, the district court entered its scheduling order.  Pursuant to that order, the deadline for Pittman to amend or join parties was on November 21, 2014, the deadline for discovery motions was June 30, 2015, and the deadline for completing discovery was July 31, 2015.

On November 11, 2014, Pittman filed an amended complaint, which added iServe as a defendant and added a claim against BSI for breach of contract.  On January 9, 2015, Pittman filed a motion for leave to file a second amended complaint in order to add Pacifica as a party and to raise additional counts.  On February 25, 2015, Pittman filed an amended motion for leave to file a second amended complaint.  On February 26, 2015, Pittman withdrew this motion.  On June 24, 2015, the district court entered an order striking the amended motion for leave to file a

second amended complaint because Pittman did not attach a copy of the second amended complaint to the motion and the court was not sure which complaint Pittman wanted to file. On June 29, 2015, Pittman filed a renewed motion for leave to file a second amended complaint. On November 9, 2015, Pittman filed notice of withdrawal of his renewed motion.[10] On November 25, 2015, BSI filed a motion for judgment on the pleadings. On December 11, 2015, iServe filed a motion for judgment on the pleadings. On January 18, 2016, Pittman filed a motion for leave to file a second amended complaint. On May 11, 2016, the district court heard and denied the motion.

The January 2016 motion was Pittman's fourth request to amend his complaint for a second time. Pittman unsuccessfully attempted to amend his amended complaint three other times. He withdrew two of those requests, and a third was struck by the district court because of his failure to comply with local rules, as mentioned above. Discovery had closed on July 31, 2015, about five months before Pittman filed his last motion for leave to amend. All the deadlines in the district court's scheduling order had expired and the case was ready to proceed to the next phase. It does not appear that Pittman tried to have the scheduling order modified. Additionally, there were two dispositive motions pending, which had been fully briefed.

In all, Pittman unduly delayed moving for leave to amend his complaint for more than a year and provided no excuse or justification for the delay. On top of that, allowing amendment months after the close of discovery and after dispositive motions were filed and briefed would have resulted in significant prejudice to the Servicers. Consequently, we do not believe the district court abused its discretion in denying this motion for leave to amend. We affirm the district court's denial of Pittman's motion for leave to amend his complaint because there was no abuse of discretion.

---

[10]We note that the district court's failure to rule on a motion for five months constituted questionable case management.

**IV.      Motion to Compel Depositions of iServe Representatives**

**Standard of Review**

The Court reviews decisions regarding discovery matters under an abuse of discretion standard. *Interactive Prods. Corp. v. a2z Mobile Office Sols., Inc.*, 326 F.3d 687, 700 (6th Cir. 2003) (citation omitted).  An abuse of discretion occurs when the reviewing court is left with "a definite and firm conviction that the court below committed a clear error of judgment." *Id.* (citation omitted).

**Analysis**

District courts have broad discretion over docket control and the discovery process. *See In re Air Crash Disaster*, 86 F.3d 498, 516 (6th Cir. 1996). "It is well established that the scope of discovery is within the sound discretion of the trial court." *Lavado v. Keohane*, 992 F.2d 601, 604 (6th Cir. 1993) (citation omitted).  "In addition to according substantial deference to the district court's discovery decisions, appellate courts will not reverse a decision to limit discovery 'absent a clear showing that the denial of discovery resulted in actual and substantial prejudice to the complaining litigant.'" *Ginett v. Fed. Express Corp.*, 166 F.3d 1213, at *4 (6th Cir. 1998) (quoting *Gile v. United Airlines, Inc.*, 95 F.3d 492, 495 (7th Cir. 1996)).

"A district court may properly deny a motion to compel discovery where the motion to compel was filed after the close of discovery." *Willis v. New World Van Lines, Inc.*, 123 F. Supp. 2d 380, 401 (E.D. Mich. 2000) (citing *Ginett*, 166 F.3d 1213).  In a number of cases, courts have denied discovery motions filed after the close of discovery. *See Glob. Fleet Sales, LLC v. Delunas*, No. 12-15471, 2016 WL 2342319, at *2 (E.D. Mich. May 4, 2016) (denying a motion to compel that was filed after the close of discovery and plaintiffs provided no explanation for the delay and had reason to know of the evidence sought prior to the deadline); *AVKO Educ. Research Found. v. Morrow*, No. 11-13381, 2013 WL 1395824, at *11 (E.D. Mich. Apr. 5, 2013); *Suntrust Bank v. Blue Water Fiber, L.P.*, 210 F.R.D. 196, 200–01 (E.D. Mich. 2002) (denying plaintiff's motion to compel 18 months after discovery had closed); *Willis*, 123 F. Supp. 2d at 401 (denying plaintiff's motion to compel made four months after the close of discovery and five days before the hearing on defendant's motion for summary judgment).

This is especially true where the moving party had the information it needed to file the discovery motion and its late filing would prejudice the other party.  *See Glob. Fleet Sales, LLC*, 2016 WL 2342319, at \*2; *Suntrust Bank*, 210 F.R.D. at 200–01.

Reviewing courts have also affirmed the denial of untimely motions to compel.  *See Craig-Wood v. Time Warner N.Y. Cable LLC*, 549 F. App'x 505, 508 (6th Cir. 2014) (finding that the district court did not abuse its discretion in denying plaintiff's motion to compel because the motion was not filed until two months after discovery closed and two days after defendant filed its motion for summary judgment); *Spurlock v. Whitley,* 79 F. App'x 837, 839 (6th Cir. 2003) (per curiam) (affirming the denial of discovery where plaintiff had ample opportunity during discovery period to examine evidence at issue); *Ginett*, 166 F.3d at \*4 (affirming the trial court's denial of a motion to compel after the discovery deadline); *see also Packman v. Chicago Tribune Co.*, 267 F.3d 628, 647 (7th Cir. 2001) (finding no abuse of discretion in denying motion to compel filed after discovery closed, the summary judgment briefing schedule had been set, and defendants had filed their summary judgment motion); *Kalis v. Colgate–Palmolive Co.,* 231 F.3d 1049, 1058 (7th Cir. 2000) (finding no abuse of discretion in denying motion to compel filed after discovery closed and summary judgment motion was filed).  "In general, a district court does not abuse its discretion by denying an untimely motion to compel that violated unambiguous discovery deadlines . . . ."  *Craig-Wood*, 549 F. App'x at 508.

The scheduling order entered on November 10, 2014 provided that the deadline for discovery motions was June 30, 2015, and the deadline for completing discovery was July 31, 2015.  Pittman added iServe as a defendant in his first amended complaint filed on November 11, 2014.  Though Pittman had more than eight months to depose iServe representatives, he did not conduct any depositions during those months.  Prior to his motion, Pittman did not seek a modification of the scheduling order.  Pittman's December 4, 2015 motion to compel was filed five months after the discovery motion deadline, and almost four months after the deadline to complete discovery.  Finally, the motion was filed more than a week after BSI had moved for judgment on the pleadings.

In light of Pittman's lack of diligence and failure to conduct any depositions of iServe representatives, we do not believe the district court abused its discretion in denying his motion to compel. Consequently, we affirm the district court's denial of Pittman's motion.

**CONCLUSION**

Based on the foregoing, we **AFFIRM in part** and **REVERSE in part** the district court's judgment and **REMAND** for proceedings consistent with this opinion.