In the

# United States Court of Appeals
## For the Seventh Circuit

No. 21-2632

JEFFREY CHAITOFF,

*Plaintiff-Appellant,*

*v.*

EXPERIAN INFORMATION SOLUTIONS, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:18-cv-7259 — **Virginia M. Kendall**, *Judge.*

ARGUED OCTOBER 24, 2022 — DECIDED AUGUST 14, 2023

Before HAMILTON, ST. EVE, and KIRSCH, *Circuit Judges.*

KIRSCH, *Circuit Judge.* In a nation of 330 million people, billions of pieces of credit information are generated each year. Mistakes in compiling and reporting that information are inevitable. Jeffrey Chaitoff sued under the Fair Credit Reporting Act alleging that Experian made a mistake when it omitted a fact from his credit report, then failed to correct its error. Chaitoff signed an agreement with his mortgage lender that allowed him to make lower payments and avoid foreclosure.

Rather than report the agreement, Chaitoff's credit report said that he was delinquent.

The district court determined that any dispute about the agreement's existence or effect was a legal dispute, meaning Experian was immune from FCRA liability for any errors related to it. We disagree. First, we hold that the omission of material information is actionable under the FCRA. Second, we hold that reporting the existence of the agreement did not involve the application of law to facts, so was not a legal error. We reverse the district court's conclusion otherwise.

The district court also concluded that Experian's handling of the situation was reasonable across the board, thus entitling it to summary judgment on alternative grounds. We disagree in part. Experian's initial reporting efforts were reasonable beyond any doubt, so it earned summary judgment on that claim, and we affirm that portion of the district court's judgment. But we disagree with the district court as to Experian's investigations after Chaitoff alerted it to the discrepancy. A reasonable jury could find that there was a cost-effective step Experian could have taken that would have discovered the agreement's existence.

Finally, we agree with Chaitoff that Experian failed to note his dispute in later reports, as the FCRA requires. We therefore affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

I

Consumers borrow money to fund expenses large and small. Deciding who gets credit and on what terms falls to what we will call furnishers—most people know them as lenders or creditors. To facilitate their lending decisions,

furnishers rely on credit reports generated by consumer reporting agencies, or CRAs. Furnishers send CRAs information about consumers' income, assets, liabilities, and payment history. CRAs then compile those data into standardized reports and, in many cases, distill it to a number—a credit score—that affects whether, how much, and on what terms a consumer can borrow. Because furnishers give credit reports and scores extraordinary weight, they underpin the national economy, and are thus the subject of federal legislation.

## A

Congress enacted the Fair Credit Reporting Act, codified at 15 U.S.C. § 1681 *et seq.*, "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007). To accomplish those goals, the FCRA tries to ensure that "consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681(a)(4).

One of the FCRA's cornerstones is § 1681e, which demands that CRAs "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." Accuracy is not defined in the statute, but it has long been understood that "accuracy" encompasses both truth and completeness—a report that is misleading or materially incomplete is inaccurate. E.g., *Koropoulos v. Credit Bureau, Inc.*, 734 F.2d 37, 39–42 (D.C. Cir. 1984); *Seamans v. Temple Univ.*, 744 F.3d 853, 865 (3d Cir. 2014).

When a consumer contends that his credit report is inaccurate or incomplete, he can dispute his report with the CRA that prepared it. The CRA is then obligated to conduct a "reasonable reinvestigation to determine whether the disputed information is inaccurate," 15 U.S.C. § 1681i(a)(1)(A), considering "[a]ll relevant information submitted by the consumer." *Id.* § 1681i(a)(4). "If the reinvestigation does not resolve the dispute," § 1681i(b) allows a consumer to "file a brief statement setting forth the nature of the dispute." If a consumer elects to do so, "unless there is reasonable grounds to believe that it is frivolous or irrelevant, the consumer reporting agency shall, in any subsequent consumer report containing the information in question, clearly note that it is disputed by the consumer and provide either the consumer's statement or a clear and accurate codification or summary thereof." *Id.* § 1681i(c). Negligent violations of these provisions are actionable under § 1681o; willful violations carry additional penalties and are actionable under § 1681n.

B

Jeffrey Chaitoff bought a home in 1995. He refinanced his mortgage through Ocwen Loan Servicing in 2012. When he lost his job in 2016, Chaitoff fell behind on his payments, and Ocwen began reporting the delinquency. Chaitoff remained at least six months behind from October 2016 until August 2017. Throughout that period, Chaitoff tried different things to avoid foreclosure. First, Chaitoff entered into an unemployment forbearance plan in August 2016 that allowed him to make very low payments to avoid foreclosure. Then, in April 2017, Ocwen sent Chaitoff an offer to enter into a Trial Period Plan (TPP). If Chaitoff completed the Plan, his monthly

payment would be reduced and his account would be brought current—that is, he would no longer be delinquent.

To adopt the Plan, Chaitoff had to make three reduced payments, one in each of May, June, and July 2017. Those payments, in turn, would be credited to his most delinquent months. In other words, although Chaitoff would write checks in May, June, and July, he would not be making those months' payments because the funds would be applied to his oldest delinquencies. Critically for our purposes, the Plan documents made clear that Ocwen "would continue to report the delinquency status of [Chaitoff's] loan to credit reporting agencies as well as [his] entry into a Trial Period Plan in accordance with the requirements of the Fair Credit Reporting Act and the Consumer Data Industry Association requirements." Ocwen warned Chaitoff that entering into a Plan, especially if he was current on his payments, could adversely affect his credit score. Chaitoff accepted Ocwen's offer, made the Plan's three reduced payments, and his loan was modified accordingly. Chaitoff eventually sold the home.

Chaitoff tried to obtain a mortgage to purchase another home but was denied. A would-be lender informed him that his denial was based on information in a credit report prepared by Experian—one of the three major CRAs. When Chaitoff requested his Experian report, he discovered what he believed were errors in his file related to his Ocwen mortgage: His report noted that he was delinquent until August 2017, and it never mentioned the TPP.

Chaitoff first disputed those errors with Experian in May 2018. His dispute letter stated:

> The Ocwen trade line on my credit report is reporting inaccurate, false, and misleading information. … As you can see from the attached documentation, in April 2017, the loan was modified after I came upon financial hardship, and my monthly payments were decreased.
>
> ***
>
> Since the modification, and agreed decrease in amount due, I made each monthly payment on time consistently throughout 2017. In accordance with the modification agreement and my timely payments, the trade line should reflect that the payments were made timely. The failure to report this information is misleading lenders into believing that I did not make payments throughout 2017.
>
> ***
>
> Please also review the attached April 17, 2018 letter stating that my modification payments were being made timely. As you can see, there is reason to believe Ocwen is reporting erroneously.

Chaitoff attached Ocwen's confirmation that his "trial payments for the modification were completed on time. The due dates were May 1, 2017, June 1, 2017, and July 1, 2017." Chaitoff also attached Ocwen's original TPP offer letter, but he did not attach the TPP's complete terms.

Experian processed the dispute through its Automated Consumer Dispute Verification (ACDV) system, which transmitted Chaitoff's letter and attachments to Ocwen. See § 1681i(a)(2)(A) (requiring CRAs to transmit "all relevant information regarding the dispute" that it receives from the consumer to the furnisher). Ocwen confirmed that Experian's reporting was correct—it reported that Chaitoff was six months behind from January through July 2017. Experian then reported the results to Chaitoff and stood by its original reporting.

Chaitoff filed a substantially similar dispute letter in July 2018. He maintained that he "made each monthly payment on time consistently throughout 2017." Experian did the same thing it did the first time: sent an ACDV request to Ocwen, which confirmed exactly what it had reported all along. In 2019, Ocwen asked that the account be deleted from Chaitoff's report.

C

Chaitoff then sued Experian alleging violations of the Fair Credit Reporting Act. Chaitoff made three claims. First, he alleged that Experian negligently and willfully failed to follow reasonable procedures to ensure the maximum possible accuracy of its reports, in contravention of § 1681e(b). Second, Chaitoff alleged that Experian negligently and willfully failed to reasonably reinvestigate the accuracy of its reporting after his letters alerted it to the potential errors, in contravention of § 1681i(a). Finally, Chaitoff alleged that Experian failed to include a statement of dispute in its subsequent reporting explaining Chaitoff's view that his Ocwen loan should be reported, in contravention of § 1681i(c).

Experian moved for summary judgment, contending that its reporting was accurate. It argued that the existence and effect of Chaitoff's TPP were both legal questions beyond its competency to resolve. Even if its reporting were inaccurate, Experian argued that it was entitled to summary judgment because its policies and reinvestigation were both reasonable beyond dispute. Experian's final argument was that Chaitoff hadn't demonstrated any harm from the purported inaccuracies.

The district court granted Experian's motion. It concluded that there was nothing inaccurate about Experian's report because Chaitoff's dispute was with how Ocwen had reported the TPP. The district court reasoned that Chaitoff's gripe was "about the legal accuracy of his loan modification, but not the factual accuracy." And since the FCRA does not require Experian to evaluate unadjudicated legal defenses to consumers' debts, there was nothing inaccurate about the report Experian prepared. The district court alternatively concluded that the reasonableness of Experian's procedures and reinvestigation was beyond dispute, thus entitling it to summary judgment despite any inaccuracy. The district court said nothing about Chaitoff's third claim. Nor did the district court reach Experian's third argument (about harm), so we say no more on the subject. Chaitoff sought reconsideration, which the district court denied. This timely appeal follows.

II

We give no deference to a district court's grant of summary judgment. And like the district court, we view the facts in the light most favorable to the nonmoving party—here, Chaitoff.

A CRA's liability under both § 1681e(b) and § 1681i(a) depends on inaccurate information—if the credit report is accurate, the consumer has suffered no damages. See *DeAndrade v. Trans Union LLC*, 523 F.3d 61, 66–68 (1st Cir. 2008); *Chuluunbat v. Experian Info. Sols., Inc.*, 4 F.4th 562, 567 (7th Cir. 2021) ("A threshold requirement for claims under both sections is that there must be an inaccuracy in the consumer's credit report."). Chaitoff argues that his Experian report was inaccurate in two ways.

First Chaitoff argues that Experian's report was inaccurate because it reported his Ocwen mortgage as delinquent in May, June, and July 2017. We disagree. The TPP's terms stated that Chaitoff's account would be reported delinquent until the TPP's conditions were satisfied and that his payments under the TPP would be applied to his most-delinquent months. Although Chaitoff may have sent Ocwen payments in each of May, June, and July 2017, those payments were applied to earlier delinquent months in accordance with the TPP's terms. Experian's reporting of those three months as delinquent was accurate beyond any doubt. The district court recognized as much, and we agree. We therefore affirm the district court's grant of summary judgment as it relates to Experian's reporting of the May, June, and July 2017 payments.

Chaitoff fares better on his second alleged inaccuracy—the omission of his TPP from his credit report. The district court granted summary judgment after concluding that Experian could not be liable for omitting Chaitoff's TPP from its reporting. After taking a fresh look, we disagree. Chaitoff alleged (1) an inaccuracy in his credit report that (2) adversely affected his creditworthiness and (3) was within the competency of a CRA to identify and correct. We take each in turn.

A

Experian concedes that the omission of material information can render technically accurate information misleading and, thus, actionable under the FCRA. It is right to do so. Courts have long understood that, when it comes to the FCRA, "accurate" means more than just "technically correct." E.g., *Koropoulos v. Credit Bureau, Inc.*, 734 F.2d 37, 40 (D.C. Cir. 1984). But somehow we have never resolved whether an omission constitutes an inaccuracy under § 1681e(b) and § 1681i(a). We avoided the question in *Henson v. CSC Credit Services*, 29 F.3d 280, 285 n.4 (7th Cir. 1994), but can no longer do so: A credit report is inaccurate under § 1681e(b) and § 1681i(a) if it omits accurate information that could reasonably be expected to adversely affect a consumer's creditworthiness. (In the interest of brevity, at times we refer in this section only to § 1681e(b); the analysis and conclusions are the same as to § 1681i(a).)

We recently adopted this materially misleading standard for another of the FCRA's provisions, § 1681s-2, which governs furnishers' responsibilities when reporting information to CRAs. In *Frazier v. Dovenmuehle Mortgage, Inc.*, 72 F.4th 769 (7th Cir. 2023), we held that to sue under that section, a consumer must show that his report was "(1) patently incorrect, or (2) materially misleading, including by omission." *Id.* at 776. We added that, "[b]y materially misleading, we mean 'misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions.'" *Id.* (quoting *Sepulvado v. CSC Credit Servs., Inc.*, 158 F.3d 890, 895 (5th Cir. 1998)). In adopting that standard, *Frazier* joined us with every other circuit to consider the question. *Id.* at 776 n.5 (collecting cases).

But Experian is not a furnisher, so § 1681s-2 is, by its own terms, inapplicable. Chaitoff's claims against Experian is under § 1681e(b), and the text of the two sections differ. Section 1681s-2 at times uses "incomplete or inaccurate." E.g., 15 U.S.C. § 1681s-2(b)(1)(E). Section 1681e, on the other hand, speaks only in terms of "maximum possible accuracy." One might draw the inference, then, that accuracy and completeness are different, and that § 1681e is thus unconcerned with omissions.

We think not. While we acknowledge the textual differences between § 1681s-2 and § 1681e, those differences do not compel a rule allowing CRAs off the hook for omitting material facts. *Frazier* and its counterparts addressing § 1681s-2 define accuracy by reference to cases addressing § 1681e(b). See, e.g., *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1163 (9th Cir. 2009) (§ 1681s-2 case citing *Sepulvado*, 158 F.3d at 895, a § 1681e(b) case); *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 890 (9th Cir. 2010); *Chiang v. Verizon New Eng. Inc.*, 595 F.3d 26, 37 (1st Cir. 2010) (treating "inaccurate" in § 1681i(a) "essentially the same" as "incomplete or inaccurate" in § 1681s-2(b)). The Fourth Circuit recognized the overlap in analysis and results:

> Although the majority of cases involve the duty of a CRA to report accurately under § 1681e, BB & T concedes that the same standard of accuracy applies to a furnisher's response under § 1681s-2. Both § 1681e and § 1681s-2 serve the same purpose: ensuring accuracy in consumer credit reporting. A CRA can best fulfill its obligation to report accurately under § 1681e if it

> receives accurate information from a furnisher
> under § 1681s-2.

*Saunders v. Branch Banking & Tr. Co. of Va.*, 526 F.3d 142, 148 n.3 (4th Cir. 2008). To be sure, courts cannot engage in textual adverse possession, relying on a practice of misreading a statute to justify continued deviation from plain text. But the text of § 1681e(b) is far from plain. The FCRA never defines "accuracy," let alone "maximum possible accuracy." Like our sister circuits, we look to context to give meaning to the text of § 1681e(b). And however ambiguous the text may be, the context is clear: material omissions render a credit report inaccurate.

One of the earliest cases to recognize the need to treat material omissions as inaccuracies was *Alexander v. Moore & Associates, Inc.*, 553 F. Supp. 948 (D. Haw. 1982). There, the court explained the difference between "accurate" and "maximum possible accuracy" by reference to a credit report stating that a consumer was "involved" in a credit card scam without noting that the consumer was a victim of the scam. *Id.* at 952. That the consumer was a victim of a scam creates an impression that is the polar opposite of that created by the statement that she was "involved" in a scam. For a statute designed to promote accuracy, false impressions can be just as damaging as false information. E.g., *Cortez v. Trans Union, LLC*, 617 F.3d 688, 709–10 (3d Cir. 2010) ("Congress surely did not intentionally weave an exception into the fabric of the FCRA that would destroy its remedial scheme by allowing a credit reporting agency to escape responsibility for its carelessness whenever misleading information finds its way into a credit report through the agency of a third party."). Section 1681i(a)(5)(A) confirms this understanding; it requires CRAs

to delete information if its reasonable reinvestigation of a dispute finds the information "inaccurate *or incomplete*" (emphasis added). For the FCRA to make sense, then, "accuracy" under § 1681e(b) must encompass both truthfulness and completeness. The alternative rule—that omissions are not actionable—would dilute § 1681e(b)'s command for "maximum possible accuracy" to a request for "minimal technical accuracy." Thus, a credit report that creates a materially misleading impression of the borrower's creditworthiness through the omission of accurate information is not accurate under § 1681e(b). Of course, an inaccuracy is a necessary, but not sufficient, condition for holding a CRA liable under § 1681e(b). We hold only that, as with § 1681s-2, a material omission satisfies that condition.

B

All agree that Experian's report said nothing about Chaitoff's TPP. The question then becomes whether that omission is material—whether it "can be expected to adversely affect credit decisions." *Frazier*, 72 F.4th at 776. Experian does not meaningfully contest the premise. And for good reason: it requires little imagination to see how the omission of a TPP might affect a consumer's creditworthiness.

Say two debtors have identical credit reports showing patterns of delinquent payments. Neither is likely to obtain credit on favorable terms, if at all. Now imagine one of the debtors completed a TPP with her creditors, but that fact is not reported in her credit file. The debtor without the TPP has no evidence that she can make timely and complete payments, but the debtor who completed the TPP does. The Sixth Circuit recognized as much. Reporting that a consumer "was delinquent on his loan payments without reporting the TPP

implies a much greater degree of financial irresponsibility." *Pittman v. Experian Info. Sols.*, 901 F.3d 619, 639 (6th Cir. 2018). The Eleventh Circuit recognized the flip side of this rule in *Felts v. Wells Fargo Bank, N.A.*, 893 F.3d 1305, 1318–19 (11th Cir. 2018):"[I]t was not misleading for Wells Fargo to report that [the plaintiff] was not making payments under the Note as agreed, particularly in light of Wells Fargo's additional statement that [the plaintiff] was paying under a partial payment agreement." Because a TPP gives potential furnishers more accurate information on a consumer's creditworthiness, omitting it precludes "maximum possible accuracy."

C

After clearing the first two hurdles, Chaitoff's § 1681e(b) and § 1681i(a) claim stumbled on the third. The district court determined that Chaitoff's dispute "lies with Ocwen about their reporting to Experian of his loan modification." From this premise, the district court determined that Chaitoff's claim is "about the legal accuracy of his loan modification, but not the factual accuracy." We disagree. The existence of a TPP is a factual, not legal, question within the competency of a CRA to identify and correct.

We have long held that CRAs are not well suited to adjudicate legal defenses to a debt, so they are not liable for reporting information that may be legally inaccurate. Put another way, while "accuracy" may mean more than just "technically correct," it never reaches beyond questions of fact.

Although the line separating legal from factual questions can be slippery, two of our recent opinions have sharpened it. *Denan v. Trans Union LLC*, 959 F.3d 290 (7th Cir. 2020), involved consumers who borrowed from Indian tribes at

interest rates prohibited by state usury laws. *Id.* at 292–93. They contended their credit reports were inaccurate because they reported the debts even though the debts were (to their minds) uncollectible (since they violated state law). *Id.* at 293. We held that the alleged inaccuracies were legal, rather than factual, because determining whether the debts were enforceable required applying choice-of-law and sovereign-immunity principles to an undisputed set of facts. *Id.* at 295. "The power to resolve these legal issues exceeds the competencies of consumer reporting agencies." *Id. Denan* reflects the classic case of a legal dispute: Everyone agreed that the consumers borrowed the amounts reflected on their credit reports, but the parties disputed whether the furnishers could do anything about those debts. The CRA could not resolve that dispute—only a court could. And since no amount of investigation by the CRA could substitute for a binding adjudication of the parties' legal dispute, the CRA's reporting was accurate.

In *Chuluunbat v. Experian Information Solutions*, 4 F.4th 562, (7th Cir. 2021), consumers challenged the accuracy of their credit reports by disputing to whom their debts were owed. *Id.* at 564. We held that dispute to be legal. *Id.* at 565. "[A]s with a pure challenge to a debt's legal validity, the plaintiffs here question the legal relationship of different parties to these debts, which is a task for a court." *Id.* at 568. *Chuluunbat* reaffirmed one of our seminal cases on the FCRA, *Henson v. CSC Credit Services*, 29 F.3d 280 (7th Cir. 1994), where we said that CRAs could not be required "to go beyond the face of numerous court records to determine whether they correctly report the outcome of the underlying action." *Id.* at 285. "Requiring credit reporting agencies to look beyond the face of every court document to find the rare case when a document

incorrectly reports the result of the underlying action would be unduly burdensome and inefficient." *Id*. at 285–86. Without notice from a consumer that a court document may be erroneous, a CRA "may rely on the accuracy of public court documents in preparing a credit report without being subject to liability under the FCRA." *Id*. at 286. Unstated but implicit in *Henson* is that CRAs can read and understand legal documents.

"The paradigmatic example of a legal dispute is when a consumer argues that although his debt exists and is reported in the right amount, it is invalid due to a violation of law." *Chuluunbat*, 4 F.4th at 567. In other words, legal disputes amount to collateral attacks on the disputed debt. But while "[t]aking notice of a previously resolved legal dispute involves some knowledge of the legal impact of court decisions, [ ] it does not require the consumer reporting agency to make any legal determinations about the underlying claim." *Id*. at 568.

Whether Chaitoff's TPP existed is a factual question because Experian was not asked to apply law to facts. Nothing in Chaitoff's complaint can be read to collaterally attack his Ocwen mortgage. Rather, Chaitoff asked that his credit report reflect his TPP, something well within Experian's capabilities. It is, after all, a credit reporting agency. Nothing about Chaitoff's alleged inaccuracy required Experian to investigate beyond the face of the documents it was provided. *Henson* held that CRAs act reasonably when they rely on legal documents of unquestioned authenticity. *Chuluunbat* recognized the flip side of the rule: a CRA might be liable if it ignores or overlooks documents of unquestioned authenticity, even if they relate to a legal dispute. Such is the case here. The

existence of Chaitoff's TPP was a factual—not legal—dispute, and the district court was wrong to conclude otherwise.

We are not the first to reach this conclusion. *Pittman* held that "failing to report the existence of [a] TPP constitutes incomplete reporting." 901 F.3d at 639. *Pittman* involved a furnisher's, rather than a CRA's, failure to report a TPP, and the district court sought to distinguish *Pittman* along that line. It narrowed *Pittman* to furnishers only: "Nothing in [*Pittman*] could be construed to hold a consumer reporting agency liable for reporting accurate information regarding the TPP that it received from the loan servicer." That begs the question, though. Whether a CRA is ultimately liable under § 1681e(b) or § 1681i(a) is distinct from whether its reporting was accurate. Experian tries to distinguish *Mileva v. Trans Union, LLC*, No. 20-cv-123 2021 WL 1172704 (N.D. Ill. Mar. 29, 2021), on the same grounds, but that opinion correctly recognized that "the failure to report the existence of the Plan or the trial period payments [can] create[] at least a triable issue of fact as to whether the [CRA's] credit report created a materially misleading impression about Plaintiff's payment and credit history." *Id*. at *7 (citing *Pittman*, 901 F.3d at 639). Given today's holding that a material omission is actionable under § 1681e(b) and § 1681s-2 alike, *Mileva* was prescient.

While there may be a separate legal dispute about whether the debtor in fact entered into a TPP with his furnisher, that is not this case. See *Brill v. TransUnion LLC*, 838 F.3d 919 (7th Cir. 2016) (affirming dismissal where consumer proposed that CRA hire a handwriting expert to determine whether he signed loan documents). Here, all agree that Chaitoff entered into a TPP and that Experian would have known about it based on the documents Chaitoff sent it. Given the FCRA's

command for maximal accuracy, the omission of Chaitoff's TPP was a misleading factual inaccuracy that can give rise to liability under § 1681e(b). The district court's contrary conclusion was incorrect. The FCRA may place different investigative obligations on furnishers and CRAs, but the end goal is the same: an accurate credit report. And a credit report that omits a TPP is not accurate. We see no reason to treat a TPP any differently than the myriad legal documents CRAs deal with day in and day out.

Experian argues that Chaitoff never challenged the omission of the TPP from his credit report, but even a cursory glance at his briefing below and the district court's opinion shows that's incorrect. We likewise reject Experian's fallback position on waiver—that Chaitoff's disputes should have been more explicit about the alleged omission. The FCRA is a remedial statute designed to protect consumers. See *Sullivan v. Greenwood Credit Union*, 520 F.3d 70, 73 n.3 (1st Cir. 2008). That Chaitoff's letters could have been clearer does not preclude relief; it may make relief less likely given the statute's requirement for only "reasonable" procedures. But in the era of notice pleading, Chaitoff's complaint alleging that Experian's reporting of his Ocwen loan was "false, misleading, and inaccurate" was more than enough to allow Experian to defend itself. That it did so with the TPP's own terms dispels any notion of waiver.

## III

Even when inaccurate information makes its way into a credit report, a CRA's liability under both § 1681e(b) and § 1681i(a) turns on whether a CRA acted reasonably. Since § 1681e(b) asks whether a CRA adopted "reasonable procedures to assure maximum possible accuracy," summary

judgment may be appropriate when a CRA adopted procedures no jury could find unreasonable. Similarly, § 1681i(a) requires only "reasonable reinvestigations." Chaitoff alleges that Experian neither enforced reasonable policies nor conducted reasonable reinvestigations. We disagree with Chaitoff and agree with the district court that Experian's policies were reasonable as a matter of law, so we affirm its grant of summary judgment as to Chaitoff's § 1681e(b) claim. But we conclude that a reasonable jury could find that, after being put on notice of the alleged inaccuracy in Chaitoff's report, Experian's reinvestigations of his dispute were unreasonable. We therefore reverse the district court's grant of summary judgment as to Chaitoff's § 1681i(a) claim.

## A

"The reasonableness of a reporting agency's procedures is normally a question for trial unless the reasonableness or unreasonableness of the procedures is beyond question." *Sarver v. Experian Info. Sols.*, 390 F.3d 969, 971 (7th Cir. 2004). We agree with the district court that Experian's reliance on Ocwen's initial reporting was reasonable beyond dispute.

Chaitoff alleges a material omission from his credit report. But to Experian, Chaitoff's TPP was an unknown unknown. Without notice of the alleged omission, Experian had no reason to suspect that Ocwen's reporting was incomplete. Ocwen is a major financial institution, and Experian regularly relies on its reporting. See *Sarver*, 390 F.3d at 972 (explaining that requiring CRAs to engage in background research on information furnished by financial institutions would balloon the costs of their services, which in turn would be passed to consumers). Chaitoff did not offer any evidence suggesting that Experian knew of the TPP based on the information Ocwen

furnished or that there were systemic problems with Ocwen's data. Furnishers bear responsibility for accurately reporting information to CRAs in the first instance. See 15 U.S.C. § 1681s-2; *Denan*, 959 F.3d at 294–95. Given Ocwen's demonstrated reliability, it was reasonable for Experian to trust that Ocwen's original information was complete and accurate. See *Sarver*, 390 F.3d at 972 (CRA's procedures not unreasonable unless the agency has reason to believe a furnisher's information is unreliable); see also *Losch v. Nationstar Mortg. LLC*, 995 F.3d 937, 945 n.6 (11th Cir. 2021) (affirming summary judgment under § 1681e(b) for reports prepared with reliable information before CRA had notice of alleged inaccuracy).

This is not to say that a material omission can never give rise to liability under § 1681e(b). Whether a CRA's procedures are reasonable turns, predictably, on balancing the costs of a marginal return to accuracy against the potential harm to consumers from declining to incur those costs. See, e.g., *Brill*, 838 F.3d at 921 ("Forcing a credit reporting agency to hire a handwriting expert in every case of alleged forgery would impose an expense disproportionate to the likelihood of an accurate resolution of the dispute."); *Henson*, 29 F.3d at 287 ("The credit reporting agency's duty will also depend on the cost of verifying the accuracy of the source versus the possible harm inaccurately reported information may cause the consumer."); cf. *United States v. Carroll Towing Co.*, 159 F.2d 169 (2d Cir. 1947). But Chaitoff never proposed an additional reasonable measure Experian could have taken to detect the omission of his TPP before he flagged the issue; doing so might have shown a dispute about the reasonableness of Experian's current procedures. Nor did Chaitoff offer evidence that Experian failed to follow its standard procedures in his case. On the record before us, no jury could find Experian's procedures

unreasonable, so we affirm the district court's grant of summary judgment as to Chaitoff's § 1681e(b) claim.

B

When a consumer disputes an item in his credit report with a CRA, the CRA's first step is to transmit that dispute to the furnisher. 15 U.S.C. § 1681i(a)(2). The furnisher then investigates the consumer's dispute and reports its findings to the CRA. The CRA then must conduct a "reasonable reinvestigation" of the dispute. *Id.* § 1681i(a)(1)(A).

Chaitoff argues that Experian did not reasonably reinvestigate either of his disputes. The district court rejected his claims, concluding that Experian's reinvestigations were reasonable as a matter of law—that they were reasonable beyond dispute. We disagree. On this record, a reasonable jury could find that either or both of Experian's reinvestigations were unreasonable. This is not to say that Experian cannot prevail—only that reasonable juries might differ.

While Experian might not be liable for failing to notice the missing TPP in the first place, "[a] credit reporting agency that has been notified of potentially inaccurate information in a consumer's credit report is in a very different position than one who has no such notice." *Henson*, 29 F.3d at 286. Since reasonableness is a question of costs and benefits, "[w]hen a credit reporting agency receives such notice, it can target its resources in a more efficient manner and conduct a more thorough investigation." *Id.* at 286–87. Thus, reasonable procedures under § 1681e(b) are not proof of a reasonable reinvestigation under § 1681i(b). See *id.*; *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) (recognizing that, because § 1681i(a)'s reinvestigation requirement mandates a

more thorough investigation than § 1681e(b), a CRA's liability under the two sections may diverge depending on the facts). "Although the parameters of a reasonable investigation will often depend on the circumstances of a particular dispute, it is clear that a reasonable reinvestigation must mean more than simply including public documents in a consumer report or making only a cursory investigation into the reliability of information that is reported to potential creditors." *Cortez v. Trans Union LLC*, 617 F.3d 688, 713 (3d Cir. 2010) (citing *Cushman*, 115 F.3d at 225).

The Eleventh Circuit reached a similar conclusion in *Collins v. Experian Information Solutions, Inc.*, 775 F.3d 1330 (11th Cir. 2015). There, Experian used the Automated Consumer Dispute Verification process to verify a furnisher's information, but it conducted no independent investigation of the consumer's dispute. *Id*. at 1331–33. The Eleventh Circuit affirmed that "an issue of material fact remained as to whether Experian's investigation was reasonable when it disregarded the … information [the consumer] provided and instead relied solely on [the furnisher] to verify the debt." *Id*. at 1333.

The Eleventh Circuit reaffirmed *Collins* in *Losch v. Nationstar Mortgage, LLC*, 995 F.3d 937 (11th Cir. 2021), which involved a mortgage debt that at first survived but was eventually extinguished by the consumer's bankruptcy. *Id*. at 940–41. Experian reported the debt long after the consumer earned the fresh start that bankruptcy promises. After the consumer alerted Experian to his fresh start, Experian resorted to the ACDV process. *Id*. at 941. The once-creditor (incorrectly) confirmed that the debt was still owed, and Experian trusted it. *Id*. The Eleventh Circuit vacated summary judgment in Experian's favor on the plaintiff's § 1681i(a) claim. *Id*. at 940.

Experian was not entitled to summary judgment as to the reasonableness of its investigation because "[i]t did nothing, although it easily could have done *something* with the information that [the consumer] provided." *Id*. at 946.

So too here. There is a facial mismatch between the letter Ocwen sent Chaitoff and the ACDV response it sent to Experian. Ocwen's letter to Chaitoff stated that his trial payments were made on time and were due on the first of May, June, and July 2017; Ocwen's ACDV response stated that Chaitoff was six-months delinquent in each of those months. Once Experian had a copy of Chaitoff's TPP documents, it could have cross-referenced them with Ocwen's ACDV response. Ocwen's reporting was technically accurate, but Experian could not have known that at the time—it didn't have the portions of the TPP explaining that trial payments would not be credited to the months in which they were made. Had Experian asked Ocwen to explain the mismatch, Ocwen might have reported the TPP's existence. A reasonable jury could conclude that Experian should have taken additional steps to investigate the mismatch between Ocwen's ACDV response and its letter to Chaitoff. Experian defends its resort to the ACDV system alone by noting that Chaitoff never presented proof of payment during the disputed months. That is incorrect: Chaitoff attached Ocwen's letter confirming that timely payments were made in May, June, and July 2017. Again, Experian could not know at the time—since it lacked the TPP's full terms—that those payments would not be credited in the months they were made. But Chaitoff did present evidence that he made timely payments in those months. A reasonable jury could find that Experian could have taken another cost-effective step that might have resolved Chaitoff's dispute.

Experian's second reinvestigation offers Chaitoff an even stronger case. In response to Chaitoff's renewed complaint, Experian repeated the same steps it took in response to his first dispute. It could not reasonably expect a different outcome. To be clear, a CRA's reinvestigation does not have to fix the mistake to preclude liability—it need only be reasonable. Still, a jury could find that repeating the same ineffective steps was not a reasonable response to Chaitoff's second letter.

A jury could not find, however, that Experian willfully failed to comply with § 1681i(a) with respect to its reinvestigation of Chaitoff's first dispute. Recall, the FCRA provides different remedies for negligent and willful violations by CRAs. 15 U.S.C. § 1681o (negligent); *Id.* § 1681n (willful). Chaitoff brought his claims under both theories. A willful violation is one committed in "reckless disregard of [its] statutory duty." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007). Reckless conduct is that which creates a risk substantially greater than that necessary to render the conduct negligent. *Id*. at 69 (quoting Restatement (Second) of Torts § 500); see also *Farmer v. Brennan*, 511 U.S. 825, 837–38 (1994) (discussing "excessive," "significant," "substantial," and "intolerable" risks). "But probability isn't everything." *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 695 (7th Cir. 2008). Recklessness also looks to the social utility (or lack thereof) of the conduct at issue. *Id*.

On this record, a jury could not find that Experian willfully failed to undertake a reasonable reinvestigation of Chaitoff's first dispute. Chaitoff's claim, at its core, is that Experian failed to detect an omission. None of the facts Chaitoff offers supports a finding that Experian was indifferent to the

harms Chaitoff alleges. And it is uncontested that Experian followed its normal procedures by transmitting Chaitoff's dispute to Ocwen; it did not wholly ignore the dispute. Nor is the discrepancy between Ocwen's response and the documents Chaitoff provided with his dispute letter so obvious that Experian's failure to pick up on it constitutes a gross deviation from what might be reasonable. Experian's response to Chaitoff's first letter may have been negligent, but it was not reckless. The record leaves no dispute that Experian was entitled to summary judgment as to Chaitoff's willfulness claim arising from his first dispute letter.

*

We establish no hard and fast rules about what is or isn't a reasonable reinvestigation. Experian's reinvestigations might have been reasonable; they might not have been, too. Likewise, the first might have been reasonable but the second not. The reasonableness of a CRA's reinvestigation is a question for the jury unless reasonableness is beyond dispute. That isn't the case here, so we reverse the district court's grant of summary judgment to Experian as to Chaitoff's § 1681i(a) claims. The district court did not address willfulness. As explained above, Experian is entitled to summary judgment as to willfulness with respect to Chaitoff's first dispute letter. On remand, the district court is free to consider anew the question of willfulness as to the second dispute letter.

IV

A consumer may continue to believe that his credit report contains a mistake even after a CRA undertakes a reasonable reinvestigation of the purported mistake. To break that logjam, Congress enacted a provision that allows consumers to add a "statement of dispute" to their credit reports—

§ 1681i(b). Those statements do not alter, but add to, the information provided by furnishers and transmitted to potential creditors. And because those statements can inform a consumer's creditworthiness, they help achieve the "maximum possible accuracy" at the core of a CRA's obligations. See *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 892 (9th Cir. 2010).

> If the reinvestigation [described in § 1681i(a)] does not resolve the dispute, the consumer may file a brief statement setting forth the nature of the dispute. The consumer reporting agency may limit such statements to not more than one hundred words if it provides the consumer with assistance in writing a clear summary of the dispute.

Section 1681i(c) operationalizes the preceding subsection by requiring CRAs to "clearly note" nonfrivolous relevant disputes in later reports "[w]henever a statement of a dispute is filed." CRAs must note that the information "is disputed by the consumer and provide either the consumer's statement or a clear and accurate codification or summary thereof." *Id.* Failure to comply with § 1681i(c) is an independent basis for liability.

Chaitoff alleges that Experian ignored his requests that such a statement be added to his credit report to reflect his understanding of the TPP, in violation of § 1681i(c). Experian's defense—one the district court credited seemingly without explanation—is that Chaitoff never filed a statement of dispute in the first place. Again, we disagree. Congress prescribed no magic words a consumer must incant to request the inclusion of a dispute statement.

The rights-creating language of § 1681i(b) is straightforward: "If the reinvestigation does not resolve the dispute, the consumer may file a brief statement setting forth the nature of the dispute." Chaitoff sent two letters to Experian explaining his discontent with its reporting. The first letter can't trigger § 1681i(b) because that is what triggered Experian's initial reinvestigation, and the statute only requires a statement of dispute to be added if the reinvestigation "does not resolve the dispute." Experian could not know whether Chaitoff believed his dispute had been resolved until it heard back from him. But it did, and Chaitoff's second letter satisfies § 1681i(b)'s simple formulation. That was enough to trigger Experian's obligations to note the dispute under § 1681i(c).

Experian leans on the use of the word "filed" in § 1681i(c) to suggest Chaitoff had to do more. But what counts as "more" Experian does not, or cannot, say. That alone is telling. Experian concedes that § 1681i(b) requires no magic words. Still, it insists that the statute requires some formal notice that the consumer wishes for his dispute to be reflected in his report. We cannot square that assertion with its earlier concession. Experian makes no model language or dedicated form available to consumers. Neither Congress nor the Consumer Financial Protection Bureau has undertaken such an effort. Nor is there a centralized system for filing and distributing consumer disputes. None of this is surprising given the remedial nature of the FCRA. See *Cortez*, 617 F.3d at 715 n.33 (3d Cir. 2010) ("Congress did not require that consumers submit disputes on specific forms, and any such technical requirement seems inconsistent with the remedial focus of the FCRA."). All of this undermines Experian's claim that "filed" can absolve it of liability under § 1681i(c) in this case.

To the extent Experian asks us to parse the word "filed," we think it draws its meaning from the FCRA's context and purpose. Throughout the credit reporting industry, consumers' data are reported in "files." See, e.g., 15 U.S.C. § 1681a(g) (defining "file" as "all of the information on that consumer recorded and retained by a consumer reporting agency regardless of how the information is stored"); § 1681i(a)(1)(A) (describing "any item of information contained in a consumer's *file*" (emphasis added)). At the time of enactment, that meant a physical file—Section 1681i(c) predates the internet and most computerized data systems. Pub. L. 91-508 § 601, 84 Stat. 1114, 1132 (1970). Even today, we refer to computer "files" stored in "folders." The simplest reading of "filed" happens to be the best: Like every other piece of relevant information provided to it, the credit reporting agency places the consumer's statement of dispute in her *file* at the CRA, so all a consumer needs to do is transmit that dispute to the CRA in a reasonable fashion. Comparing § 1681i(c) to other provisions reinforces that understanding. Other documents a consumer submits, like a "notice of dispute," see § 1681i(a), trigger some action on the CRA's part, but they are not necessarily included in the consumer's *file* for disclosure to prospective furnishers. The statement of dispute, by contrast, requires the CRA to do nothing other than include it in subsequent reporting. They may elect to shorten the statement or seek clarification, but by the FCRA's plain text, Experian would have fulfilled its statutory obligations under § 1681i(c) if it had copied Chaitoff's letter verbatim and included it in later reports. Read alongside the FCRA's other verbs and with an eye towards the era of the FCRA's enactment, "filed" offers Experian neither the support nor illumination it hopes for.

Experian next argues that it provided Chaitoff with all the information he needed to clarify that he was filing a statement of dispute. It points to § 1681i(b)'s second sentence: "The consumer reporting agency may limit such statements to not more than one hundred words if it provides the consumer with assistance in writing a clear summary of the dispute." But what a CRA *may* do in response to a statement of dispute tells us nothing about what constitutes such a statement in the first place. Experian says that its responses to Chaitoff's letters told him that he could file a statement of dispute if he wished. Again, the FCRA contains no magic words requirement; Congress placed the burden on CRAs to recognize a statement of dispute and act accordingly. Chaitoff's letters provided more than enough for Experian to fulfil its obligations. As best we can tell, it simply chose not to. Finally, Experian suggests that Chaitoff had to propose the text of his own statement of dispute—its proposed language is in its brief. This understanding turns the language of § 1681i(b) on its head.

After receiving Chaitoff's disputes, Experian had two options: it could include "*either* the consumer's statement *or* a clear and accurate codification or summary thereof." § 1681i(c) (emphases added). The onus was on Experian to seek or author a clarified version of Chaitoff's dispute if it believed his version was ambiguous or verbose.

V

In sum, we hold that the omission of the TPP from Chaitoff's credit report presents a factual question, not a legal one. We also hold that it is disputable whether Experian's reliance on an ACDV response that conflicted with other documents in its possession amounted to a reasonable reinvestigation. Finally, we hold that the FCRA's statement-of-dispute

provision does not require consumers to use any magic words or specific form to request that such a statement be added to her report. Rather, the burden rests with the CRA. It can either accept a consumer's statement of dispute as-is and add it to her file, or it can initiate a collaborative process for synthesizing that statement into an accurate and complete synopsis of the consumer's concern.

We affirm the district court's grant of summary judgment on Chaitoff's § 1681e(b) claim. But on the record before us, there was a genuine dispute of material fact as to whether Experian's reinvestigations were reasonable. We therefore reverse the district court's grant of summary judgment on the § 1681i(a) and § 1681i(c) claims. The district court can structure the proceedings on remand as it sees fit.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED